**Affirmed and Opinion filed November 13, 2014.**



In The

# Fourteenth Court of Appeals

NO. 14-14-00393-CV
NO. 14-14-00416-CV

## IN THE INTEREST OF S.R., S.R. AND B.R.S., CHILDREN

**On Appeal from the 300th District Court
Brazoria County, Texas
Trial Court Cause No. 70722**

## O P I N I O N

In these consolidated appeals, both D.R. (the Father) and D.S. (the Mother) appeal from the decree terminating their parental rights to three children, S.R. (Scott), S.R. (Sally), and B.R.S. (the Baby) (collectively, the Children).[1] The Father raises three issues challenging the sufficiency of the evidence supporting the trial court's termination findings and the failure to appoint counsel for him until after the first adversary hearing. The Mother raises a single broad issue challenging the sufficiency of the evidence supporting termination. We affirm.

---

[1] To protect the identities of the minors, we have not used the actual names of the Children, parents, or other family members. *See* Tex. R. App. P. 9.8.

# I. BACKGROUND

The record reflects that the Mother and Father were married in early 2009, but they separated in January 2012. The Children were very young during these proceedings: Scott was born in March 2010, Sally was born in January 2011, and the Baby was born in July 2012.

In 2011 and early 2012, before the youngest child was born, the Department of Family and Protective Services (the Department) became involved with the parents after receiving several referrals alleging drug use, unsanitary living conditions, physical abuse, sexual abuse, and neglect. Although the Department's investigation later ruled out physical and sexual abuse of the Children, the Department was concerned about the parents' acknowledged untreated mental illnesses and instances of domestic violence in front of the Children. The parents were offered family-based safety services for protection of the Children, and in May 2012, they signed the first of several safety plans outlining services for the safety and protection of the Children.

Shortly thereafter, it was alleged that the Mother left Scott and Sally alone with her father (the Grandfather). The safety plan had specified the Children were not to be left alone with the Grandfather because of his health problems and history of marijuana use. At that time, the two older children were living with the Father and his girlfriend, and the Mother had supervised visits.

In July 2012, shortly after the Baby was born, the Department's caseworker visited the Mother and instructed her in safe care of the Baby. The Mother signed another safety plan to include protection of the Baby. Later that same month, the Father was arrested and charged with assaulting the Mother. After the Father was arrested, all three Children were placed in the Mother's care, with her mother (the Grandmother) supervising her contact with the Children.

2

At a visit in September, the caseworker found the Children at the Father's home unsupervised, and she was concerned for their safety. The Department also alleged the parents did not comply with the safety plans, particularly those services addressing domestic violence issues. On September 20, 2012, the parents signed an agreement for Parental Child Safety Placement voluntarily placing the Children with a friend, Melissa Green. The parents were permitted supervised visits with the Children until their service plans were completed. In November, the Father was arrested for possession of drug paraphernalia. In early December, the Department became concerned about other individuals who were staying in Green's home, and the Mother had also moved into the home.

On December 3, 2012, Green advised the caseworker that the Mother took the Children away from her home unsupervised and their whereabouts were unknown. The Department then petitioned for protection of the Children, seeking custody and termination of the parents' parental rights. After an emergency hearing, the court found an immediate danger to the health or safety of the Children and named the Department temporary managing conservator of the Children. The Children were missing for two days before the parents returned them to the Children's Protective Services (CPS) offices. By this time, the Father was no longer living with his girlfriend.

A full adversary hearing was set for December 13, 2012. The record reflects the Father was present at the adversary hearing, but the Mother was not. The court found there was a danger to the physical health and safety of the Children and signed an order naming the Department temporary managing conservator of the Children. The Children were placed in foster care, and the parents each were granted supervised visits at the CPS office.

On January 17, 2013, the court appointed CASA, an acronym for Court Appointed Special Advocates, as guardian ad litem for the Children. *See* Tex. Fam.

Code § 107.031. A status hearing was held January 31, 2013. The Mother was present, but the Father was not. He was represented by counsel, however. The initial permanency hearing was held May 30, 2013. The Father was present, but the Mother was not. A permanency hearing was held on October 17, 2013. The parents were not present. Another permanency hearing was held January 30, 2014, and both parents were present.

The case was tried to the court on May 6–8, 2014. The Mother was not present at trial and her whereabouts were unknown. Two of the Department's caseworkers, the CASA volunteer, a mental health professional, a mental health caseworker, a police officer, and the Father testified at trial. At the conclusion of the trial, the court granted the Department's request for termination of both parents' parental rights. On May 16, 2014, the court signed a judgment reciting that both parents' parental rights were terminated based on findings that termination is in each of the Children's best interest and that the parents committed acts establishing the predicate termination grounds set out in subsections D, E, and O of Texas Family Code Section 161.001(1). Tex. Fam. Code §§ 161.001(1)(D), (E) & (O); 161.001(2). The Department was appointed sole managing conservator of the Children. Both parents filed notices of appeal.[2]

## II. BURDEN OF PROOF AND STANDARDS OF REVIEW

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In the Interest of C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is

---

[2] The Father's appeal was docketed under case number 14-14-00393-CV, and the Mother's appeal was docketed under case number 14-14-00416-CV. The appeals were ordered consolidated.

imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of the termination of parental rights, the burden of proof is heightened to the clear and convincing evidence standard. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *accord In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

Parental rights can be terminated upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(1) of the Family Code; and (2) termination is in the best interest of the child. Tex. Fam. Code §§ 161.001(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Only one predicate finding under section 161.001 is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

In reviewing the legal sufficiency of the evidence in a parental-rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266. We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *In re J.O.A.*, 283 S.W.3d at 244; *In re J.F.C.*, 96 S.W.3d at 266.

5

In reviewing termination findings for factual sufficiency of the evidence, we consider and weigh all of the evidence including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. We give due deference to the factfinder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109. We are not to "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003) (explaining that in a parental-rights termination case, an appellate court should not reweigh disputed evidence or evidence that depends on a witness's credibility).

### III. ISSUES ON APPEAL

In his first issue, the Father argues that the trial court reversibly erred in failing to appoint an attorney to represent him until after the adversary hearing had been completed. In his second issue, the Father asserts that the evidence is legally and factually insufficient to support the trial court's finding that the Children were removed from him due to abuse or neglect, as required by the predicate termination ground in section 161.001(1)(O). The Father alleges in his third issue that the evidence is legally and factually insufficient to support the trial court's endangerment findings in section 161.001(1)(D), (E). The Father's third issue includes a challenge to the legal and factual sufficiency of the evidence supporting the trial court's finding that termination of his parental rights is in the Children's best interest. *See* Tex. Fam. Code § 161.001(2).

The Mother has alleged a single broad issue challenging the sufficiency of

6

the evidence to support the trial court's termination findings.[3] Although the Mother's issue is broadly worded, she has not argued or cited authority that the evidence is insufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code § 161.001(2).

If disposition of an issue would result in a rendition of judgment, an appellate court should consider that issue before addressing any issues that would only result in a remand for a new trial. *See Natural Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 201 (Tex. 2003); *see also In re K.W.*, 138 S.W.3d 420, 428 (Tex. App.—Fort Worth 2004, pet. denied) (applying this rule in a termination of parental rights appeal and first addressing legal sufficiency challenges). Accordingly, we first consider the challenges to the legal sufficiency of the evidence, followed by a review for factual sufficiency.

## IV. PREDICATE TERMINATION GROUNDS

Both parents challenge the legal and factual sufficiency of the evidence to support the predicate termination grounds. The trial court found three predicate grounds for termination: subsections D, E, and O of section 161.001(1). *See* Tex. Fam. Code § 161.001(1)(D), (E) & (O). Relevant to this proceeding, section 161.001(1) provides in relevant part that termination of parental rights is warranted if the trial court finds by clear and convincing evidence, in addition to the best

---

[3] Included in the Mother's issue is an argument challenging the appointment of the Department as the sole managing conservator of the Children When parental-rights termination is sought, appointment of a managing conservator is governed by section 161.207, which provides that if a court terminates the parent-child relationship of both parents, "the court shall appoint a suitable, competent adult, [the Department], a licensed child-placing agency, or an authorized agency as managing conservator of the child." Tex. Fam. Code § 161.207(a). A trial court does not abuse its discretion in appointing the Department as conservator of the children where the evidence is sufficient to support termination of parental rights. *In re C.N.S.*, No. 14-14-00301-CV, 2014 WL 3887722, *13 (Tex. App.—Houston [14th Dist.] Aug. 7, 2014, no pet.) (mem. op.). As discussed herein, the evidence in this case is sufficient to support termination of the parents' parental rights. Accordingly, we hold the court did not abuse its discretion by appointing the Department as the Children's managing conservator.

interest finding, that the parent has:

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

> . . .

> (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child;

Tex. Fam. Code § 161.001(1)(D),(E) & (O).

Because subsections D and E both concern endangerment and the evidence on each may overlap in some respects, we address both of these predicate findings together.

## V. ENDANGERMENT

Both subsections D and E of section 161.001(1) use the term "endanger." "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

Endangerment under subsection D may be established by evidence related to the child's environment. *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). "Environment" refers to the acceptability of living conditions, as well as a parent's conduct in the home. *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ). A child is endangered when the

8

environment creates a potential for danger that the parent is aware of but consciously disregards. *See In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.); *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Inappropriate, abusive, or unlawful conduct by a parent or other persons who live in the child's home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection D. *In re M.R.J.M.*, 280 S.W.3d at 502.

Under subsection E, the evidence must show the endangerment was the result of the parent's conduct, including acts, omissions, or failure to act. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* A court properly may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct." *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.—El Paso 2012, no pet.). While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffers injury; rather, the specific danger to the child's well-being may be inferred from parents' misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.—Fort Worth 2004, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re A.B.*, 412 S.W.3d 588, 599 (Tex. App.—Fort Worth 2013), *aff'd*, 437 S.W.3d 498 (Tex. 2014).

In evaluating endangerment under subsection D, we consider the child's environment before the Department obtained custody of the child. *See In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Under subsection E, however, courts may consider conduct both before and after the

Department removed the child from the home. *See Avery v. State*, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no writ) (considering persistence of endangering conduct up to time of trial); *In re A.R.M.*, No. 14-13-01039-CV, 2014 WL 1390285, at *7 (Tex. App.—Houston [14th Dist.] Apr. 8, 2014, no pet.) (mem. op.) (considering pattern of criminal behavior and imprisonment through trial).

Because the inquiry under both subsections D and E includes the conduct of the parent, evidence of criminal conduct, convictions, or imprisonment is relevant to a review of whether a parent engaged in a course of conduct that endangered the well-being of the child. *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712-13 (Tex. App.—El Paso 2012, no pet.). Evidence of the parents' criminal histories was presented at trial. The Father received deferred adjudication probation for theft by check on September 24, 2009. He testified the probation was later revoked and he spent about thirty days in jail. The Father was arrested for assaulting the Mother in July 2012. He was also arrested for possession of drug paraphernalia in November 2012. The Father was arrested and jailed for theft at the time of the January 2014 permanency hearing. In addition, he was arrested for possession of a drug detection device in April 2014.

The Mother was convicted of theft on August 22, 2013, and she was sentenced to sixty-eight days in county jail. At the same time, she was convicted of assault causing bodily injury and sentenced to a concurrent sixty-eight days in county jail. On January 23, 2014, the Mother was convicted of another assault causing bodily injury to a family member, the Grandfather, and she was sentenced to 100 days in county jail. In January 2014, the Mother acknowledged she had been arrested for assault three times in the last year and a half.

In addition, "[d]omestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). The

Department's Family-Based Safety Services (FBSS) caseworker, Donzell Bellow, testified at trial about her involvement with the family from June 4, 2012 until December 2012. Bellow testified she was concerned about the domestic violence around the Children and stated the Children were not safe with their parents. Bellow testified the parents admitted to domestic violence in front of the children. At trial, however, the Father denied ever hitting the Mother. Bellow testified that the Mother received a broken nose in one incident, and that the Father was arrested for another assault in July 2012. The Father told Bellow that when he took the Children to visit their Mother, "she wouldn't get out of the car" and "started fighting him, trying to stay in the car. He took off with her and then he threw her out of the car" while the Children were in the car.

Bellow also testified to another incident in December 2012, when she was concerned for the Children's safety. The Mother removed the Children from the voluntary placement, and the Children were missing for two days. The Department obtained an emergency order to take custody of the Children. Although the Father at first denied knowing where the Mother and Children were, he located them and with the Grandmother's help, convinced the Mother to return the Children. Bellow and another caseworker were following the parents, who had the Children in the car, to ensure they returned the Children to the CPS office. The co-worker observed the Father hitting the Mother. The police were notified about the assault, and officers were at the CPS office when the parents arrived. The officers questioned the Mother about the assault, but she denied it. Bellow testified that in her opinion, these incidents of domestic violence were conditions that endanger the physical and emotional well-being of the Children.

A parent's drug use can also qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *See In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Continued

11

illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct. *Cervantes–Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253–54 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc).

Bellow testified about the Mother's drug use. Early in the case, the Mother had tested positive for marijuana, despite her denial that she used marijuana. As a result of the positive drug test, the Mother was asked to participate in a drug assessment, but she left the facility without completing the assessment. The Mother testified at the January 2014 hearing that she had last used illegal drugs, namely "speed," the previous July. Bellow testified she was also concerned about the Mother's appearance as indicative of drug use. She appeared to lack proper hygiene: she was dirty, had sores all over her face and body, and her teeth were decayed.

As for the Father, Bellow was concerned about his possible drug use. Bellow had a strong belief that the Father was using drugs, and she was aware of his arrest for possession of drug paraphernalia. The Father told Bellow the drugs found in the car at that time belonged to his friend. Bellow explained that the Department did not routinely test for "K2," synthetic marijuana, and special tests were required. She testified that parental drug use around children endangers them.

At trial, the Father denied drug use. On cross-examination, he admitted that he had smoked K2, resulting in a positive drug test, because of the stress of the CPS case. He claimed that the drug use resulting in the positive test was an isolated incident, and he stated the Children were not present. The Department's caseworker acknowledged at trial that the Father's drug tests during the last year were negative.[4] The Father had missed some scheduled tests, however. In addition,

---

[4] Although the record contains the parents' drug tests that were positive for "K2," or synthetic marijuana, the reports were not authenticated and were admitted for only limited

Officer Joshua Rowland testified about the Father's arrest for possession of a drug test falsification device called "Safeguard U Pass Synthetic Urine" on April 4, 2014. The Father admitted to the officer that the device was his property. At trial, however, the Father claimed that the device was not his and he never used it.

The Department's caseworkers also testified about their concerns that the parents were not participating in the court-ordered services. A parent's efforts to improve or enhance parenting skills are relevant in determining whether a parent's conduct results in endangerment under subsection E. *See In re D.T.*, 34 S.W.3d 625, 640 (Tex. App.—Fort Worth 2000, pet. denied). Failure to maintain stability endangers the child's physical and emotional well-being. *See In re A.B.*, 412 S.W.3d at 599.

In her testimony at the January 2014 hearing, the Mother agreed she had not done a good job in completing her services over the past year. Bellow testified she was concerned about the Mother's instability. There was evidence that the Mother had no safe home and no employment. Caseworker Schrelle Atkinson, who was assigned the case in September 2013 after the previous caseworker left the Department's employ, testified that until the Mother was incarcerated in January 2014, she had trouble locating her. After the Mother's release from jail in early 2014, she was not employed and was living with her uncles in Bay City.

Caseworker Atkinson testified that at the time of the permanency hearing in January 2014, the Father was in jail on a theft charge. The caseworker testified that as a result of the Father's incarceration, he was not able to be employed, support his family, or visit the Children. The Father admitted he was not employed before he was arrested. He testified he lost one plumbing job because the company

---

purposes related to the parents' service plans, not as evidence of drug use. *See* Tex. R. Evid. 105. Therefore, we do not consider the results of the positive drug tests as evidence of drug use for purposes of the sufficiency analysis.

downsized and he lost another because he took off work to visit the Mother when she was hospitalized. The Father explained that his failure to attend therapy and complete his other services was due to a lack of transportation. He testified he had a car, but lacked funds to buy gas. He also complained that the Department changed his therapist. The caseworker explained that another therapist had been added to the Father's service plan because that therapist was qualified to provide behavior therapy to treat the Father's bipolar condition.

The record also contains evidence related to the parents' mental health and their failure to participate in services related to treatment. Mental illness alone is not grounds for terminating the parent-child relationship. *Maxwell v. Tex. Dep't of Family & Protective Servs.,* No. 03–11–00242–CV, 2012 WL 987787, at \*9 (Tex. App.—Austin Mar. 23, 2012, no pet.) (mem. op.). Untreated mental illness can expose a child to endangerment, however, and is a factor the court may consider. *See id.* at \*10; *In re L.L.F.,* No. 02–11–00485–CV, 2012 WL 2923291, at \*15 (Tex. App.—Fort Worth July 19, 2012, no pet.) (mem. op.) (considering a parent's failure to take medication to treat mental health issues as a factor in creating an environment that endangers the child's emotional or physical well-being); *In re J.I.T.P.*, 99 S.W.3d at 845 (considering a parent's mental health and non-compliance with her medication schedule as factors in endangering the child).

Caseworker Bellow was concerned that the parents violated the safety plans and failed to comply with the court-ordered services related to treatment for their mental health. She testified, "we did not feel the home was stable enough for the kids to reside in because the parents were not cooperating with services to get the help that was needed." Both parents acknowledged that they failed to comply with the recommendations for therapy. The Father admitted he did not take medications recommended to treat his conditions, and he testified he did not believe he needed medication any more.

14

Venette C. Westhoven, Ph.D., a clinical psychologist, testified at trial about the psychological evaluations she performed on the parents in July 2012. She diagnosed the Father with bipolar disorder and borderline personality disorder. The Father told her that he had been diagnosed with borderline personality disorder in 2011 when he was in the military. Westhoven described bipolar disorder as a mood disorder that involves a combination of manic episodes and depressive symptoms. An individual in a depressive episode has "difficulty motivating, getting things done. In a manic episode, a [person] has difficulty concentrating." She testified not only does a parent with this untreated condition have difficulty meeting the parent's own needs, the parent finds it difficult to meet a child's needs. With borderline personality disorder, a person has traits including perceived abandonment and rejection, an unstable, volatile, and intense pattern of relationships, unstable self-image, impulsivity, reactive mood, irritability, anxiety, chronic feelings of emptiness, feelings of isolation and paranoid ideation that can include self-harm and harm to others, suicidality, moodiness, irritability, and difficulty controlling anger. Westhoven added that the component of difficulty controlling anger puts a person at risk for hurting someone else. The instability, irritability, difficulty controlling anger, and intense volatile relationships can negatively impact a child. Westhoven was concerned about the Father's lack of emotional stability and the personality characteristics described above making it difficult for him to implement effective parenting strategies. Westhoven testified she would be concerned if the Father failed to take medication for bipolar disorder and failed to undergo treatment for borderline personality disorder.

At the time of her evaluations, Westhoven found no indications that the Children were in danger at that point, but based on her diagnoses, she recommended that the Department monitor and supervise closely the Father's home environment. She had concerns about the Father's parenting ability. She

recommended counseling to address the Father's personality characteristics, specifically individual or group Dialectical Behavioral Therapy. She discussed domestic violence with the Father. He told her that he tries to remain nonphysical, but the Mother hits him and that he has to defend himself by restraining her.

Westhoven diagnosed the Mother with adjustment disorder, anxiety, and depression. She explained that with depression, a person lacks motivation and has difficulty finding the energy to take care of one's children. The Mother also admitted using marijuana, but she told Westhoven she last used it in September 2011. The Mother later acknowledged that she had a positive drug test in May 2012. Westhoven testified drug use "impairs functioning, which then would impair parenting." Westhoven recommended the mother participate in individual counseling and also recommended the Mother, who was pregnant at the time, be reevaluated after the birth of the Baby so that a medication evaluation could be made. Westhoven also recommended the Mother complete a drug treatment program, follow up with a support group, participate in parenting classes, and attend family therapy with the Children.

Westhoven acknowledged that neither parent had participated in treatment with her since her July 2012 evaluations. The parents also acknowledged they did not engage in therapy. Additionally, the Father admitted that he did not regularly take his recommended medication. The Father later testified, however, that he had been in therapy with CPS-selected therapists from 2012 until trial.

The Department also presented testimony from Crystal Carpenter, a former crisis case manager for the Gulf Coast Center of Galveston County MHMR (Mental Health and Mental Retardation). She explained that as a crisis case manager, she worked to assist people with psychiatric needs who are in crisis. Either from referrals or through the crisis hotline, she responded to "people with suicidal thoughts or hearing voices or just having a really bad time, to assist with

them not going into inpatient hospitalization." Carpenter described her duties to perform an initial crisis assessment and work to alleviate the crisis so the patients could be referred to the adult clinic, avoiding hospitalization. Her office arranged for "telemedicine" to provide medication for the patients. She explained that in telemedicine, a patient at the Angleton clinic, which has special video equipment, can be evaluated by a psychiatrist in a remote location "over the TV," and the patient can receive access to medication in emergency situations.

Carpenter testified she completed a crisis assessment on the Father on January 7, 2013. The Father told her he was depressed about the CPS case, and he was having suicidal thoughts. He acknowledged he had experienced suicidal thoughts in the past. Carpenter set up an appointment for telemedicine and provided the Father transportation to the clinic. She testified the Father was prescribed medication—Effexor XR, Depakote ER, Hydroxyzine, and Elavil. Carpenter again provided the Father transportation to the follow-up visit to evaluate the Father's medication. She stressed to the Father the importance of taking his medication. Carpenter testified that the Father also called her on January 30, 2013, and told her he had a fight with his roommate and "[h]e was feeling like he wanted to hurt him." She called a mental health deputy to transport the Father to a hospital. The Father acknowledged he spent two to four weeks at St. Joseph's psychiatric ward in February 2013, after stating he felt homicidal. After that incident, the Father was scheduled to be evaluated at the adult clinic in Angleton, but he was a "no-show." Carpenter then scheduled the Father an appointment with Dr. Aviles, a psychiatrist in Alvin, and she provided transportation to that appointment on March 21, 2013. The Father was supposed to have another follow-up visit in four to six weeks, but he did not attend any further appointments.

This evidence of the parents' failure to comply with services to improve their mental health is a factor that the trial court could have considered in finding

17

that the parents engaged in a course of conduct that endangered the physical and emotional well-being of the Children. *See In re J.I.T.P.*, 99 S.W.3d at 845 (finding mother's suicidal thoughts and history of noncompliance with medication schedule relevant to endangerment analysis).

Reviewing all the evidence—including the evidence summarized above—in the light most favorable to the termination findings under subsections D and E, we conclude that a reasonable factfinder could have formed a firm belief or conviction as to the truth of the finding that the parents engaged in endangering conduct and left the Children in endangering conditions. *See In re J.O.A.*, 283 S.W.3d at 344. In light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of these termination findings is not so significant that a factfinder could not reasonably have formed a firm belief or conviction as to the truth of these termination findings. *See In re H.R.M.*, 209 S.W.3d at 108. As the finder of fact and sole judge of the credibility of the witnesses, the trial court was free to disregard any or all of the parents' self-serving testimony. *See In re S.A.H.*, 420 S.W.3d 911, 927 (Tex. App.—Houston [14th Dist.] 2014, no pet.). We hold the evidence is legally and factually sufficient to support the predicate termination findings under subsections D and E.

Having determined that the evidence is sufficient to support the trial court's finding on these statutory grounds, we need not consider whether the evidence would support subsection O—the other ground for termination challenged in the Father's second issue. *See In re A.V.*, 113 S.W.3d at 362 (affirming termination decree based on one predicate without reaching second predicate found by the trier of fact and challenged by the parent); *In re B.K.D.*, 131 S.W.3d 10, 16 (Tex. App.—Fort Worth 2003, pet. denied). We overrule the Mother's sole issue and the main component of the Father's third issue concerning the endangerment predicate grounds.

# VI. BEST INTEREST

We next address the remainder of the Father's third issue, in which he contends the evidence does not support the trial court's finding that termination of his parental rights is in the best interest of the Children. Before terminating a parent's rights, the factfinder also must find that terminating the parent's rights is in the child's best interest. Tex. Fam. Code § 161.001(2); *see also In re A.V.*, 113 S.W.3d at 362 (noting that the primary focus of parental-rights termination proceedings is protecting the best interest of the child). We review the entire record in deciding a challenge to the court's best-interest finding. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013).

There is a strong presumption that the best interest of a child is served by keeping the child with the child's natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code § 263.307(a).

Courts may consider the following nonexclusive factors in reviewing the sufficiency of the evidence to support the best-interest finding: the desires of the child; the present and future physical and emotional needs of the child; the present and future emotional and physical danger to the child; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). As noted, this list of factors is not exhaustive, and evidence is not required on all of the factors to support a finding that terminating a parent's parental rights is in the child's best

interest. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533.

In addition, the Texas Family Code sets out factors to be considered in evaluating the parent's willingness and ability to provide the child with a safe environment, including: the child's age and physical and mental vulnerabilities; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities. Tex. Fam. Code § 263.307(b); *R.R.,* 209 S.W.3d at 116.

### Criminal Activity, Including Domestic Violence

We begin our analysis by noting that evidence supporting termination under one of the grounds listed in section 161.001(1) also can be considered in support of a finding that termination is in the best interest of the Children. *See In re C.H.*, 89 S.W.3d at 27 (holding the same evidence may be probative of both section 161.001(1) grounds and best interest). Thus, it is appropriate to consider at the outset the evidence recited above relevant to endangerment. The Father's criminal activity, especially the history of domestic violence in front of the Children, supports the trial court's best-interest finding. The trial court reasonably could have considered that the Father's repeated acts of violence would continue in the future. *See Walker,* 312 S.W.3d at 617. The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *In re M.R.J.M.*, 280 S.W.3d at 502.

### *Stability and Compliance with Services*

Evidence that the Father did not comply with the court-ordered service plan for reunification with the Children also supports the trial court's best-interest determination. *See In re E.C.R.*, 402 S.W.3d at 249. The parents' family service plans were admitted in evidence. The tasks in the Father's service plan included that he engage in domestic violence counselling, complete parenting education classes, complete anger management classes, participate in individual counseling including a psychological evaluation and compliance with any recommendations therefrom, remain drug and alcohol free and submit to random drug tests, obtain and maintain safe and stable housing, and attend all court hearings and visitations with the Children. The Father acknowledged at trial that the Department's caseworker explained to him that his failure to complete the prescribed services could result in his parental rights being restricted or terminated. He testified he understood the requirements of the plan, but he acknowledged he had not completed it.

Caseworker Atkinson testified at trial about the Father's failure to complete the court-ordered services that were designed to help him parent the Children safely. Atkinson testified that this failure was one reason the Department sought termination of his parental rights and that returning the Children to the Father was not in their best interest. The Father had not refrained from criminal activity, including domestic violence, as recited above. The Father also used drugs and did not comply with all of the court-ordered urinalyses; Atkinson testified he missed approximately four appointments. Atkinson also testified the Father did not complete domestic violence counseling or anger management classes. He did not comply with all the recommendations from the original psychological evaluation. The Father did not continue his medication, so he was required to complete an additional psychological evaluation. The evidence at trial reflected that the Father

failed to appreciate the need for treatment to combat his history of mental instability. Therefore, the factfinder could infer that the Father's mental health issues likely would recur and further jeopardize the Children's well-being. *See In re R.W.*, 129 S.W.3d at 741.

Evidence of a parent's unstable lifestyle also can support a factfinder's conclusion that termination of parental rights is in the child's best interest. *In re S.B.*, 207 S.W.3d 877, 887 (Tex. App.—Fort Worth 2006, no pet.). Lack of stability, including a stable home, supports a finding that the parent is unable to provide for a child's emotional and physical needs. *See In re G.M.G.*, ___ S.W.3d ___, 2014 WL 2826363, at *12 (Tex. App.—Houston [14th Dist.] June 19, 2014, no pet.); *see also Doyle v. Tex. Dep't of Protective & Regulatory Servs.*, 16 S.W.3d 390, 398 (Tex. App.—El Paso 2000, pet. denied) (holding that a parent's failure to provide a stable home and provide for a child's needs contributes to a finding that termination of parental rights is in the child's best interest).

The record reflects the Father has not maintained stable employment. He was unemployed for most of the year and a half that these proceedings were pending. He testified at trial that he had been employed at Admiral Glass and Mirror for about three months. In addition, the Father had not maintained stable housing. The Department's caseworker testified that the Father had moved often and not notified the Department about the moves. He sometimes stayed with friends, he resided in a Salvation Army shelter at one point, and stayed in a motel for a short period. In July of 2013, the Father rented a mobile home and lived there about three months. There was some evidence from the CASA volunteer that the previous caseworker found the home was clean and appropriate for children. Photographs of the home were offered, but not admitted, in evidence. The Father already had been evicted from this residence when the new caseworker Atkinson had an opportunity to visit. When she saw the residence, there were no working

utilities, and the home was very dirty. After the eviction, Atkinson said the Father was "transient from location to location." The Father testified at trial that he recently had obtained a new residence. Neither the Department nor the CASA volunteer had had an opportunity to evaluate the residence. Caseworker Atkinson testified that she was informed the Father was residing with a friend in Houston, but he was not there when she visited. She also testified the Father provided no lease agreement to establish his residence. Even if the Father's new home had been determined to be appropriate, the factfinder may conclude that a parent's changes shortly before trial are too late to have an impact on the best-interest determination. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (explaining that a father's "efforts to improve his ability to effectively parent on the eve of trial [were] not enough to overcome a decade of poor parenting and neglect" in evaluating the best interest of the children).

The factfinder reasonably could have concluded the Father's lack of stability supported the finding that termination is in the Children's best interest. *See L.Z. v. Texas Dep't of Family & Protective Servs.*, No. 03–12–00113–CV, 2012 WL 3629435, at *10–11 (Tex. App.—Austin Aug. 23, 2012, no pet.) (mem. op.) (holding the best-interest finding was supported where the father had a history of instability, domestic violence, and criminal activity, and Department planned to have the child's foster family adopt him); *see also In re A.D.*, 203 S.W.3d 407, 411–12 (Tex. App.—El Paso 2006, pet. denied) (affirming termination of parental rights because mother failed to meet family service plan's material requirements including drug assessment, finding a job, and providing a safe home).

### *Parenting Abilities*

The factfinder may consider a parent's parenting skills in a best interest analysis. *See In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.). The Father testified that before the Children were removed from the parents'

care, he had been a "stay-at-home parent." He testified he fed and bathed the Children, put them to bed and played with them. He testified he provided only non-physical discipline and used positive reinforcement. The Father testified that the Children had seen their doctor regularly and they had all their immunizations. While the Mother usually took the Children to the doctor, if they were very sick he took them to the doctor or emergency room. The Father also testified that he had completed a parenting class. While the Father was in the Army in the fall of 2011, Sally had to be hospitalized with an "abscess." The Father testified that he returned from Fort Hood to be with her and take care of his family. He later admitted he was absent without leave, and he received an "other than honorable" discharge from the Army.

Evidence was also presented, however, that the parents had not provided sufficient care for the Children before they were removed from the home. Caseworker Bellow testified that when the Department became involved in the case, there was concern about the condition of the home and that the Children were unclean. When the Children came into the Department's care, they were seen by a physician. The Baby was underweight and the Department was concerned about her failure to gain weight. Sally needed dental care; her front teeth were "rotten." In addition, Scott needed surgery for a hernia, and the parents had not made any arrangements for the surgery. Bellow conceded, however, that the Children appeared properly fed and clothed and had no bruises.

The Father had not attended all of his scheduled visits with the Children. He explained that his visits were sometimes scheduled during work hours and he could not attend. The Father's visits were then moved to the Women's Center to accommodate his schedule, and the Grandmother attended the visits with him. The Father had four visits with the Children at the Women's Center, but the Center did not permit the CASA volunteer or the Department's caseworker to observe the

visits. The CASA volunteer reported that after the Children's visits were moved back to the Department's office, the Father stopped attending the visits. Thus, the CASA volunteer, who had been assigned the case for over a year, had been able to observe the Father with the Children only one time. The Children appeared happy to see their Father, and there was no indication the relationship was improper.

While there is some evidence that the Father had the ability to parent the Children, the factfinder reasonably could have determined that this factor does not outweigh the other factors supporting the trial court's best interest finding.

### *Children's Desires, Needs, and Proposed Placement*

The Children were very young at the time of trial and there is no evidence of the Children's desires. When children are too young to express their desires, the factfinder may consider whether the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). A child's need for permanence through the establishment of a "stable, permanent home" has sometimes been recognized as the paramount consideration in a best-interest determination. *See In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.). Therefore, evidence about the present and future placement of the Children is relevant to the best-interest determination. *See C.H.*, 89 S.W.3d at 28.

The evidence shows the Children had bonded with the foster parents and were well-cared for by them. *See In re J.M.*, 156 S.W.3d 696, 706 (Tex. App.— Dallas 2005, no pet.). The CASA volunteer testified at the January 2014 permanency hearing about how well the Children were doing in their placement.[5] At first, the Children had been behind in their emotional and social development,

---

[5] The Children's first foster home was determined to be unsatisfactory and the Children were moved to the current placement in May 2013, a year before trial.

25

but at the time of the hearing, they were "on target" for their ages. She explained, "They're speaking well. They have developed nice manners. They no longer hit, bite, and pull hair. They were exhibiting some real violence toward each other at times early on in the case." In recommending termination of both parents' rights, she testified, "They've been in and out of jail. They haven't stayed in any one place for any particular period of time."

At trial, the CASA volunteer testified that she was concerned that the parents had not complied with their court-ordered services. She stated, "I believe that the parents need to make a lot of changes in their lives, even to take care of themselves. And in order to take care of children, they have to be able to stabilize themselves and be able to support themselves. And I don't see this happening." In requesting that the parents' rights be terminated, she explained, "I believe that children deserve and need parents who can meet their needs. I believe that these parents are basically unable to meet their own needs and take care of themselves, and I don't believe that adding three children to the mix would help the parents or the children. I don't believe that they would be able to offer the stability and the — just the basic needs of guidance and care that children require. These are three very active little children who require a great deal of attention and effort." The CASA volunteer also was concerned that the Father was not taking medication for his mental health issues. She stated, "I believe that his mental health issues need to be addressed. And he told me himself about his mental health issues; so, I know that he's aware of them." She also added that neither parent had answered her questions about their plans to provide and care for the Children. There was no evidence apart from his testimony that the Father had the ability to care for three small children on his own.

The CASA volunteer also described the Children's foster home, which she had visited many times. She testified, "They're in a home with a married couple

who have a son who is, I believe, nine. They are very happy. The girls share a bedroom, and [Scott] shares a bedroom with their son. He's very proud of it. They—the [foster parents'] son is just delighted with the younger children. He loves being the big brother. They seem to be extremely happy and well-adjusted. They're doing really, really well." She also stated that the Children were "in a very good daycare that has really helped them grow intellectually and socially." She testified that in her opinion, termination of the parents' parental rights is in the best interest of the Children. *See* Tex. Fam. Code § 107.002(e) (setting out the guardian ad litem's duty to testify regarding her recommendations relating to the best interests of the child and the reasons for the recommendations). This evidence supports the trial court's best-interest finding.

In sum, the record contains sufficient evidence to support the best-interest finding based on the Father's lack of stable housing, lack of stable employment, noncompliance with services, pattern of domestic violence, and other criminal behavior that resulted in periods of incarceration, even while these proceedings were pending. Viewing all the evidence in the light most favorable to the judgment, we conclude that a factfinder could have formed a firm belief or conviction that termination of the Father's parental rights is in the Children's best interest. *See J.F.C.*, 96 S.W.3d at 265–66. In light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the best-interest finding is not so significant that a fact finder could not reasonably have formed a firm belief or conviction that termination of the Father's parental rights is in the Children's best interest. *See In re H.R.M.*, 209 S.W.3d at 108. After considering the relevant factors under the appropriate standards of review, we hold the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship is in the Children's best interest. We therefore overrule the best-interest challenge in the Father's third issue.

# VII. APPOINTMENT OF COUNSEL

In his first issue, the Father asserts that the trial court reversibly erred in failing to appoint an attorney to represent him until after the adversary hearing. *See* Tex. Fam. Code § 262.201(a) (requiring the trial court to conduct a full adversary hearing within fourteen days after the children are removed from parental custody by a governmental agency).[6] He asserts that it is apparent from the record that he appeared in opposition to the termination proceedings and that he was indigent. The record reflects that on the day of the adversary hearing on December 13, 2012, the Father signed a Request for Appointment of Counsel, certifying he was without means to employ counsel. He also completed a questionnaire about his financial resources, stating he was unemployed and had no assets. The trial court signed an order that day finding the Father indigent and appointing counsel to represent the Father's interests.

The clerk's record does indicate that the Father was unrepresented at the time of the adversary hearing, but the clerk's record does not reflect whether he filed the request for counsel before or after the adversary hearing. There is no reporter's record from the adversary hearing. The Father testified at trial that when he arrived for the adversary hearing, he informed the Department caseworker that he wanted an attorney. He stated he was told by the associate judge that he would have to "wait." Because there is no record of the adversary hearing itself, we do not know whether appellant requested counsel before the hearing and was told to "wait" by the associate judge.

---

[6] This statute was amended effective September 1, 2013, to add sections (a-1), (a-2) and (a-3), requiring that the court, before the adversary hearing, admonish unrepresented parents of the right to a court-appointed attorney, direct the completion of an affidavit of indigence by a parent claiming indigence, and appoint an attorney if the court determines the parent is indigent. *See* Act eff. Sept. 1, 2013, 83rd Leg., R.S., ch. 810, § 9, 2013 Tex. Gen Laws 2026, 2029 (codified at Tex. Fam. Code § 262.201(a-1)–(a-3). "The changes in law made by this Act apply only to a suit affecting the parent-child relationship filed on or after the effective date of this Act." *Id.* at § 12. Thus, these amendments do not apply to this case, which was filed in 2012.

Texas has adopted a statutory scheme for providing counsel to assist indigent parents, mandating the appointment of an attorney ad litem to represent the interests of an indigent parent who responds in opposition to the termination of the parent-child relationship in a suit filed by a governmental entity. *See* Tex. Fam. Code § 107.013(a)(1); *see also In re B.G.*, 317 S.W.3d 250, 253–54 (Tex. 2010) (recognizing indigent parents are entitled to appointed counsel in parental rights termination cases). Specifically, the Family Code provides that in suits filed by a governmental entity the trial court "shall appoint an attorney ad litem to represent the interests of: (1) an indigent parent of the child who responds in opposition to the termination . . . ." Tex. Fam. Code § 107.013(a)(1).

Section 107.013(d) provides that a "parent who claims indigence under Subsection (a) must file an affidavit of indigence in accordance with Rule 145(b) of the Texas Rules of Civil Procedure before the court can conduct a hearing to determine the parent's indigence under this section." *Id.* § 107.013(d). Thus, a parent's filing of an affidavit of indigence "trigger[s] the process for mandatory appointment of an attorney ad litem." *In re V.L.B.*, ___ S.W.3d ____, No. 01-14-00201-CV, 2014 WL 4373567, at * 3 (Tex. App.—Houston [1st Dist.] Sept. 4, 2014, no pet.) (quoting *In re K.L.L.H.*, No. 06-09-00067-CV, 2010 WL 87043, at *5 (Tex. App.—Texarkana Jan. 12, 2010, pet. denied) (mem. op.)). After a parent has filed an affidavit of indigence, the court may, but is not required to, conduct a hearing to determine whether the parent is indigent. *See* Tex. Fam. Code §263.0061(b).

Unlike section 107.012 requiring appointment of an attorney ad litem for a child, section 107.013 contains no specific timetable for appointing an attorney ad litem to represent the parent's interests. *See In re M.J.M.L.*, 31 S.W.3d 347, 354 (Tex. App.—San Antonio 2000, pet. denied). Courts have found that the complete failure of a trial court to appoint counsel to represent the interests of indigent

parents constitutes reversible error. *See, e.g., In re V.L.B.*, ___ S.W.3d ____, No. 01-14-00201-CV, 2014 WL 4373567, at * 5 (citing *In re C.D.S.*, 172 S.W.3d 179, 185–86 (Tex. App.—Fort Worth 2005, no pet.)). In this case, we are asked to determine whether the appointment of counsel was untimely.

The Father cites *In re J.M.*, 361 S.W.3d 734 (Tex. App.—Amarillo 2012, no pet.), in which the court stated it was apparent from the record that the indigent mother was "responding in opposition to the termination," requiring appointment of counsel under section 107.013. *Id.* at 737. The court in *J.M.* stated that "when a parent files an answer contesting the termination and requests appointment of counsel, the trial court must, at a minimum, conduct an inquiry into whether the parent is indigent and, if the court finds that the parent is indigent, must appoint counsel." *Id.* In today's case, the Father did not file an answer contesting the termination before requesting appointment of an attorney ad litem to represent his interests. In *J.M.*, the mother proceeded to *trial* without an attorney. Thus, *J.M.* does not support the Father's contention that the trial court erred in this case.

Section 107.013(d) requires that a parent who claims indigence under section 107.013(a) must file an affidavit of indigence before the court can conduct a hearing to determine the parent's indigence. Tex. Fam. Code § 107.013(d). Here, the Father signed a written request for appointment of counsel, with information supporting his indigence claim, on December 13, 2012. Counsel was appointed the same day. Assuming the Father's documents were sufficient to trigger the process for mandatory appointment of an attorney ad litem,[7] the trial court completed that process promptly upon receiving the Father's documents. We hold the trial court

---

[7] The document addressing indigence was not sworn or notarized. Therefore, it was not an "affidavit of indigence," as required by section 107.013(d). *See* Tex. Gov't Code § 312.011(1) (defining "affidavit" to include the requirement that it is sworn before a notary or other official). Nonetheless, the trial court determined the Father was indigent and appointed an attorney ad litem to represent his interests.

did not err in appointing counsel for the Father after the adversary hearing. *See In re K.P.*, No. 09-13-00404-CV, 2014 WL 4105067, at \*13 n.3 (Tex. App.—Beaumont Aug. 21, 2014, no pet.) (mem. op.) (holding no abuse of discretion when court appointed counsel at next status hearing after adversary hearing, which occurred over fifteen months prior to trial); *In re C.Y.S.*, No. 04-11-00308-CV, 2011 WL 5971068, at \*4–5 (Tex. App.—San Antonio Nov. 30, 2011, no pet.) (mem. op.) (holding no abuse of discretion where at hearing on temporary orders, trial court expressly deferred ruling on appointment of counsel for mother because it found mother had not "appeared in opposition to this suit or has not established indigency" as required by statute, and counsel was subsequently appointed the same day the affidavit of indigence was filed).

In addition, trial did not commence for almost a year and a half after the attorney ad litem was appointed. We note the Father's attorney ad litem was appointed in time to move—and did move—to set aside the temporary order signed at the adversary hearing that named the Department temporary managing conservator of the children. Accordingly, the record does not reflect that any error in the timing of counsel's appointment probably led to the rendition of an improper judgment. Tex. R. App. P. 44.1(a)(1). The Father's first issue is overruled.

## VIII. CONCLUSION

We have concluded that legally and factually sufficient evidence supports the trial court's finding of at least one predicate ground under section 161.001(1) as to both the Mother and Father, and that termination of the Father's parental rights is in the best interest of the Children. We have also held that the trial court did not err in waiting to appoint an attorney ad litem to represent the Father's interests until after the adversary hearing.

31

Having overruled the parents' issues, we affirm the trial court's judgment.


/s/    J. Brett Busby
Justice


Panel consists of Chief Justice Frost and Justices Christopher and Busby.