

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

Nos. 07-17-00187-CV
07-17-00188-CV

## IN THE INTEREST OF R.B. AND A.D.T., CHILDREN

On Appeal from the 100th District Court
Carson County, Texas
Trial Court Nos. 11616 & 11617, Honorable Stuart Messer, Presiding

October 19, 2017

## MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and PARKER, JJ.

This is an appeal from final orders terminating the parental rights of A.R.T. to R.B. and A.D.T. A.R.T questions the legal and factual sufficiency of the evidence underlying the trial court's finding that termination was in the best interests of the children and warranted under § 161.001(b)(1)(E) of the Texas Family Code. We affirm.

*Standard of Review*

The pertinent standards of review are those discussed in *In re L.P.*, No. 07-17-00155-CV, 2017 Tex. App. LEXIS 8924 (Tex. App.—Amarillo Sept. 20, 2017, no pet. h.) (mem. op.). We apply them here.

*Statutory Ground for Termination*

The trial court found "by clear and convincing evidence that [A.R.T.] . . . engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child, pursuant to § 161.001 (b)(1)(E), Texas Family Code." A.R.T. contends that, while she may have engaged in an instance of conduct endangering her children, she "did not engage in a course of conduct, or knowingly place the child with persons who engaged in conduct that endangered the child's physical health or emotional development." We disagree.

Parental rights may be ended under § 161.001(b)(1)(E) of the Family Code if the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child. *In re T.R.C.*, No. 07-15-00389-CV, 2016 Tex. App. LEXIS 3110, at *7 (Tex. App.—Amarillo Mar. 25, 2016, no pet.) (mem. op.). Both the parent's acts and omissions may be considered in determining whether this statutory provision warrants termination. *Id.*

Yet, A.R.T. is correct; one act or omission of the parent is not enough. Rather, the evidence must illustrate a voluntary, deliberate and conscious course of conduct that endangers the child. *Id.* For instance, endangerment may arise from evidence establishing a course of conduct that subjects the child to a life of uncertainty and instability. *R.R. v. Tex. Dep't of Family & Protective Servs.*, No. 03-16-00528-CV, 2016 Tex. App. LEXIS 11864, at *5-6 (Tex. App.—Austin Nov. 3, 2016, no pet.) (mem. op.). A parent's engagement in criminal activity that risks incarceration also falls within that category. *Id.* at *6. So too may a parent's use of drugs in a manner affecting her ability to actually parent the child qualify as sufficient endangerment. *Id.* at *6-7; *accord In re*

2

*J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (stating that "[w]e . . . agree that a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct").

And, while A.R.T. suggests that the pertinent time frame viewed by the court is that transpiring before removal, she is mistaken here. Viewing the circumstances through such a limited window may apply to terminations under § 161.001(b)(1)(D) of the Family Code, *See, e.g., Ybarra v. Tex. Dep't of Human Servs.*, 869 S.W.2d 574, 577 (Tex. App.—Corpus Christi, 1993, no writ) (so stating), but not under subsection (E). The former provision focuses on whether the parent allowed the child to remain in conditions and surroundings that endangered the child's physical or emotional well-being. TEX. FAM. CODE ANN. § 161.001(b)(1)(D) (stating that termination may be ordered where the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child"). That is, it focuses on the child's living environment before removal. *In re A.M.B.*, No. 01-14-00322-CV, 2014 Tex. App. LEXIS 13450, at *10 (Tex. App.—Houston [1st Dist.] 2014, no pet.). So, logically, evidence of the child's surroundings after removal has little relevance under (D).[1] The same is not true of the triggering factors of (E), though.

As previously mentioned, it takes a course of conduct evincing endangerment to satisfy (E). Establishing such a course of conduct necessarily implicates both a timeline

---

[1]This is not to say, though, that the likelihood of the objectionable environment continuing if the child were eventually returned to the parent is irrelevant to the overall decision to terminate parental rights. Termination is founded upon satisfaction of two elements, i.e., proof of a statutory condition authorizing termination and proof that termination is in the best interests of the child. *In re J.O.A.*, 283 S.W.3d at 345. The potential for the child being returned to an environment endangering his or her well-being is quite relevant to the topic of the child's best interests.

or time period and more than one act occurring within it. It denotes ongoing conduct that exposes the child to risks and uncertainties, as opposed to a snapshot of the environment in which the child lived before removal. Furthermore, instances of a parent's bad acts occurring after removal of the child from the home continue to fill in the timeline. That is, they further prove the course of conduct considered detrimental to the child; they also prove its ongoing nature and the continued risk facing the child if returned to the parent. So, evidence of misconduct after removal of the child should be considered in assessing whether the requisites of (E) have been met. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *see also In re K.P.*, 498 S.W.3d 157, 171-72 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (citing *In re S.R.* and noting that the parent's conduct after the Department takes custody of the child may be considered under (E)).

Finally, the authority cited by A.R.T. to suggest that the tenets of (E) may only be satisfied via evidence of what a parent did before removal is actually unfounded. Each case she mentioned, e.g*., In re J.K.F.*, 345 S.W.3d 706 (Tex. App.—Dallas 2011, pet. dism'd), and *In re C.L.C.*, 119 S.W.3d 382 (Tex. App.—Tyler 2003, no pet.), cite to a common origin for the proposition. That origin is the *Ybarra* opinion cited earlier. Yet, *Ybarra* involved termination based on grounds akin to (D), not (E). It dealt with the precursor of § 161.001(b)(1)(D), or what was then numbered as § 15.02(1)(D) of the Family Code. Like the former, the latter provision authorized termination when a parent "knowingly place[d] or knowingly allow[ed] a child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." *Ybarra v. Tex. Dep't of Human Servs.,* 869 S.W.2d at 577. Given these circumstances, *Ybarra*

did not purport to address the statutory scenario implicated in *J.K.F.* and *C.L.C.* So, it could not serve as authority for the statements uttered in *J.K.F.* and *C.L.C.* That being said, we turn to the case at bar.

The record before us contains evidence that A.R.T. was the mother of both R.B. and A.D.T. She also married R.T. while pregnant with A.D.T., even though he was not the biological father of either child. By then, R.B. was about thirteen years old.

R.T. began ingesting methamphetamine sometime before coming to live with the family. A.R.T. became aware of this, permitted him to remain, but allegedly told him to stop. So too did R.T. smoke marijuana, a fact of which A.R.T. also knew. When asked at trial whether she allowed him to keep marijuana in the house, she replied no and that he kept it in his truck.

The incident precipitating removal of the children involved methamphetamine. Despite her supposed objection to the drug, she said R.T. "conned" her into taking the substance. Allegedly he convinced her that it would allow them to have highly satisfying sex. So, she agreed, ingested the substance at least twice over what would be called a three-day "bender."

A.D.T. was in the possession and care of A.R.T. during that extended "bender," as was R.B. who would journey in and out to a friend's home. Soon, though, A.R.T. and R.T began exhibiting psychosis. They not only came to believe that A.R.T. was possessed by demons but also thought an airplane had sprayed the home with a white substance. The substance supposedly entered the home via air conditioning ducts and began to cause sores on the children. Later investigation of the premises by law

enforcement officials would reveal no white substance in the home or sores on the children.

There came a point during the same "bender" where A.R.T. grabbed A.D.T. who slept nearby. Believing that the child was not breathing, she began shaking the several-month-old infant.

Law enforcement authorities personally witnessed aspects of A.R.T.'s conduct after R.T. called them to the scene. This led them to initiate removal of the children from the premises.

Though A.R.T suggested that she did not abuse drugs, other evidence contradicted that. For instance, she told R.T. she sampled methamphetamine after leaving high school some years earlier. R.T. also testified that she would acquire marijuana herself on occasion. The eldest child also described how R.T. and A.R.T. journeyed outside the house to smoke marijuana and cigarettes while leaving the thirteen-year-old to care for A.D.T. Additionally, A.R.T.'s counselor suspected that A.R.T. had taken methamphetamine more than once. Another counselor stated that A.R.T. "appeared high" during one of her visits with the children after their removal. He described her as "so animated." So too did he hear her repeatedly utter "it's 2017 and there's going to be no questions asked" during the visit; he knew not what she meant by the statement. Other evidence indicated that A.R.T. and R.T. smoked marijuana together not only after the children were removed from the home but also when reunification was attempted.[2]

We further note the evidence that R.T. was not the only person who used drugs and with whom A.R.T. associated. Nor was R.T. the only person who took meth and

_____

[2] The children were removed once again upon discovery of this.

was permitted by A.R.T. to be in the presence of the children. According to her, A.D.T.'s biological father was a "meth addict" who came to see the child for a brief time.

Evidence of A.RT.'s historic association with others who abused marijuana and methamphetamine, her own abuse of methamphetamine and marijuana when the children were under her supervision, her leaving a newborn infant in the care of R.B. when she (A.R.T.) and R.T. smoked marijuana, her shaking A.D.T. while experiencing drug-induced psychosis, her subsequent appearance before a counselor while seeming to be "high," her authorizing R.T. to keep drugs in his truck, and her continued use of controlled substances after the children were removed is evidence allowing a reasonable fact-finder to form a firm conviction and belief that A.R.T. engaged in a course of conduct that endangered the physical or emotional well-being of both A.D.T. and R.B. Moreover, the disputed evidence was not so significant as to prevent the fact-finder from arriving at that conclusion. Thus, the statutory finding of the trial court was neither legally nor factually insufficient.

*Best Interests of the Child*

Merely finding a statutory ground warranting termination does alone not authorize the trial court to end the parent-child relationship. Termination must also be in the best interests of the child. TEX. FAM. CODE ANN. § 161.001(b)(2). We stress that it is the best interests of the child, not the parent. So, while a parent may want to maintain the relationship and strive to improve himself, that is not determinative; the child's best interests control.

There is no definitive test for deciding when termination is in the child's best interests. However, the non-exclusive factors first itemized in *Holley v. Adams*, 544

7

S.W.2d 367, 371-72 (Tex. 1976), help guide our inquiry. *In re A.M.*, No. 07-17-00094-CV, 2017 Tex. App. LEXIS 8994, at *6 (Tex. App.—Amarillo Sept. 21, 2017, no pet. h.) (mem. op.) (per curiam). In lieu of further lengthening this opinion by individually mentioning those factors here, we opt to consider them in relation to the evidence of record.

First, we include into the mix the evidence of A.R.T.'s course of conduct that endangered her children. *See id.* (stating that evidence satisfying the statutory ground for termination is relevant when assessing the child's best interests). To that we add the evidence that 1) the children were placed with foster parents after removal from A.R.T.; 2) the foster parents have expressed interest in adopting both children if none of the children's relatives cared to; 3) R.B. was about fifteen years old at the time of termination and wished to remain in the school she has attended while in the care of her foster parents; 4) R.B. moved to three different schools during the ten-week period she was reunified with A.R.T. and R.T.; 5) R.B. is involved in activities at the school she attends while in foster care; 6) a therapist stated that it would not be in R.B.'s best interest to be returned to her mother and agreed that it could be "devastating to herself esteem and her ability to survive;" 7) R.B. provided "a lot of" the caregiving to her baby sister while living with their mother; 8) A.D.T. would seek consolation or protection from R.B. as opposed to A.R.T. during visitations after removal; 9) at the last supervised visitation, R.B. appeared to be the parent while attempting to console A.R.T. who was emotional; 10) A.R.T. often ignored the directions of the therapist supervising the parent/child visitations after the children were removed; 11) R.T. interacted better with the children than did A.R.T. during their supervised visitations; 12) the needs of the

8

children were being met while in their current placement; 13) the children appeared happy in their current placement; 14) A.R.T. had a history of depression and anxiety; 15) A.R.T.'s counselor initially diagnosed A.R.T. as "either delusional or in denial regarding her drug use[] and that . . . she had a dual diagnosis of mental illness and chemical dependency;" 16) A.R.T suffered from "engrained" narcissistic personality and displayed grandiosity; 17) A.R.T. tended not to accept responsibility for her actions; 18) A.R.T. had not filled the medication prescribed to her to combat her mental issues for approximately a year before trial; 19) A.R.T.'s personality and attitude improved little until the trial date neared; and 20) A.R.T.'s counselor had "concerns" about A.R.T. continuing to be a parent with "legal rights" while A.R.T. was not taking her medication.

Other evidence disclosed that A.R.T. would tend to compete with R.B. during their visitations rather than attempt to support the child. Finally, when asked whether she would allow her own children to live with A.R.T., the latter's counselor said "no."

The totality of this evidence is sufficient to permit a fact-finder to reasonably form a firm conviction and belief that termination of A.R.T.'s parental rights was in the best interests of the children. Moreover, the disputed evidence was not so significant as to prevent the fact-finder from arriving at that conclusion. Thus, the trial court's finding that termination was in the best interests of the children had both legally and factually sufficient evidentiary support.

Both issued raised by A.R.T. are overruled. We affirm the final orders terminating A.R.T.'s parental rights to R.B. and A.D.T.

Brian Quinn
Chief Justice

9