In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-22-00370-CV

IN THE INTEREST OF B.M. AND L.M.

On Appeal from the County Court at Law No. 3
Montgomery County, Texas
Trial Cause No. 21-09-12043-CV

## MEMORANDUM OPINION

Mother appeals the termination of her parental rights to her children, Blake and Lauren.[1,2] Father appeals the termination of his rights to his son, Blake. In Mother's appeal, she contends that the evidence presented to the trial court was legally and/or factually insufficient to support the trial court's findings terminating

---

[1] We refer to Appellants as "Mother," and "Father," and the children, Blake's paternal grandmother, and the children's foster parents by pseudonyms to protect their identities. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2] Mother also has an older child from a previous relationship, but he is not part of this appeal.

her parental relationship with the children,[3] including the trial court's best interest finding.[4] Father argues that the language of his service plan was insufficiently specific to be enforceable, and further argues that the trial court's best interest finding is unsupported by legally or factually sufficient evidence.[5] We affirm.

## I. Background

Law enforcement authorities received information about illegal activity taking place in the house that Mother and Father shared with Blake, Lauren, and an unrelated renter.[6] Pursuant to that information, the authorities sought and obtained a search warrant, and while executing the warrant at the house, they discovered methamphetamine that Father later was charged with possessing. Both Mother and

---

[3] Lauren's father voluntarily completed an affidavit relinquishing his parental rights to her, and he is not a party to this appeal. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(K).

[4] Based on the jury's verdict, the trial court terminated Mother's rights on four predicate grounds, including condition endangerment and conduct endangerment. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D) and (E). The trial court further found that Mother had failed to comply with a court order incorporating the terms of her plan of service. *See id.* § 161.001(b)(1)(O).

[5] As with Mother, the trial court terminated Father's rights on grounds of condition endangerment, conduct endangerment, and failure to comply with a court order incorporating the terms of his plan of service. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), and (O). In addition, the trial court found that Father had used a controlled substance in a manner that endangered Blake, and then had either failed to complete a court-ordered substance abuse treatment program or had continued to abuse a controlled substance after completion of such a program. *See id.* § 161.001(b)(1)(P).

[6] This tenant was renting from the owner of the house, not from Mother or Father.

Father were arrested, as was the renter, and the children were taken into the care of the Department of Family and Protective Services ("the Department") and placed in foster care. The Department originally hoped to reunite the family, but after Mother and Father initially complied with their service plan, they both relapsed into their previous habits; both parents were arrested for illegal drug possession, and at the time of trial, Father was serving a prison sentence for possession of methamphetamine. The Department then amended its approach to the children's welfare and moved to terminate Mother's and Father's parental rights so that the foster parents could adopt the children. We summarize the evidence below.

## A. Mary Nichols' Testimony

Nichols, a supervisor with the Department, testified that she was the investigator who removed the children from the home in early May of 2021. She described the circumstances of the removal, recalling that law enforcement authorities requested "immediate assistance" while executing a search warrant for an unrelated matter and discovering possible child abuse or neglect. Nichols identified photographs of the parents' home, along with the children, and noted that the unkempt condition of the home was potentially dangerous for small children. More specifically, Nichols observed medication within the children's reach, a staircase with no railing, a shotgun, and syringes. Although the renter indicated that the gun and the syringes belonged to her, there were additional hazards in the home,

3

including spoiled food in the dining room; also, Father admitted to methamphetamine use.

The children were taken to the Department office, where personnel noted that Blake had some minor scratches on his ribcage, and Lauren had one or two small foreign bodies embedded in the sole of her right foot. Although Blake did not need medical attention for his scratches, Lauren did see a doctor to remove the "metal splinters" in her foot. The children were taken into emergency custody on the date of removal and were placed in foster care.

## B. Teresa Horton's Testimony

Horton described her role as the parents' current caseworker, indicating that it included developing a plan of service in the expectation of reuniting the family. The parents' plans required them to complete parenting classes, a parenting collaboration group, a drug and alcohol assessment and drug screening, a psychological evaluation, to maintain employment and stable housing, and to obtain "recommendations of individual counseling[.]" At first, Mother and Father "were doing okay[,]" with their service requirements, but Father later "had a relapse[,]" and was incarcerated on a drug possession charge. Eventually, Mother's compliance also declined; she missed drug tests, and has been inconsistent in visiting the children. She also was arrested on a drug charge, failed to attend a required court

4

appearance, and eventually admitted her drug use. Because of these issues, the goal changed from family reunification to adoption.

Horton located Blake's paternal grandmother, Katherine Phillips, through a "diligent search[.]" Although Phillips expressed an interest in taking the children, this potential solution to the matter was problematic because Phillips did not live in Texas, and because she was not related to Lauren. The Department also was concerned about Phillips' ability to handle Blake's autism. The children were, however, doing well in their foster home, where the foster parents were getting Blake the various types of therapy he needs.

## C. Toia Bennett's Testimony

Bennett, the parents' initial caseworker, testified that at the beginning of the case, the parents were cooperative and were working their services, and Bennett anticipated that the children would be returned to the parents. She testified regarding the attempts to locate a relative who could assume care of the children. But, she stated that the Department could not place the children with a relative in Georgia without first following the requirements of the Interstate Compact for the Placement of Children.

## D. Francine Stanfield's Testimony

Stanfield, the children's CASA advocate, described her role as a volunteer advocate trained to work with children and families in foster care. She confirmed

prior testimony to the effect that the parents initially had properly worked their required services, but things changed when the parents failed to timely return the children after an unsupervised visit. Shortly after that date, Father went to prison and Mother remained charged with abuse of prescription medication, so CASA recommended that the children remain in their placement with the foster parents and that the parents' rights be terminated.

Stanfield's observations of the children indicated that their speech, behavior, and weight had improved since removal. In particular, she testified that their speech had improved, as had their weight. She also confirmed the foster parents' characterization of the family as close and noted that Blake and Lauren are emotionally close to each other.

### E. Mother's Testimony

Mother testified that as of the date of trial, she had been sober 120 days. At that time, she was living at Recenter, a sober residential facility, and was working at the veterans' hospital, sterilizing medical equipment.

When asked about the events leading to the parental rights termination suit, Mother acknowledged her drug use and Father's imprisonment for methamphetamine possession. She denied, however, that either she or Father would experience difficulties safely caring for the children if they were returned to her and Father because he has "learned his lesson." Mother also explained that the house did

not usually look like the pictures in evidence, because those pictures reflected the condition of the house after "the police raided and destroyed the house." She further testified that the children did not have access to the weapon or syringes in tenant's upstairs room or the steep staircase leading to that room, because the access point was behind a locked door. Mother explained her need to rent the property, despite its suboptimal appearance, noting that she had been living with her grandmother, but they did not get along. She therefore needed to find available residential property immediately.

Mother acknowledged having failed to complete her service plan, including required drug tests, but explained that leaving work to take a drug test could have jeopardized her job. In addition, Mother conceded that she was abusing prescription medication, and that abuse led to her inpatient rehabilitation and current sober living facility.

Mother hoped that Father's mother would be able to take care of the children until Mother could arrange a stable living situation, and that she and Father would again be a couple.

## F. Katherine Phillips' Testimony

Phillips, a navy veteran, is Father's mother. She lives in Georgia like her other three children and has a relationship with her five grandchildren who also live in Georgia. Although she wanted a deeper relationship with Blake and Lauren, the

7

distance made that difficult. When she learned that Mother and Father were facing a termination of their parental rights, she began her effort to become a licensed foster parent so that she could assume the children's care. If permitted to do so, she planned to raise the children, and testified to her ability to protect the children and afford their care.

**G. Allison Mayfield's Testimony**

Ms. Mayfield has been the children's foster mother since late July 2021. She is a homemaker, and she and her husband have two older children who have adjusted well to having foster children in the home. She described the children's behavior at the time they came into her care, recalling that Lauren wanted to be carried constantly, cried frequently, did not sleep well, and often hit Blake. Blake also exhibited problematic behavior: at the slightest inconvenience, he would strike his head against a wall or his bed; pick his fingers and toenails until they bled; and urinate on the floor, the wall, and in his bed. Much of this behavior has improved now that the children are in a stable environment and their behavioral issues have been addressed. She further testified that Blake's communication level has improved and expressed her willingness to get Blake the therapy he needs. She and her husband hope to adopt the children.

## H. Neil Mayfield's Testimony

Mr. Mayfield, the children's foster father, described Blake's favorite activities as watching the older children's sporting events, and playing outside on the trampoline or in the pool. As a family, they go to parks and the zoo, and both Blake and Lauren enjoy these outings. In his opinion, it was in the children's best interest to remain in a stable home, and he wanted the court to terminate Mother's and Father's parental rights so that he and his wife could adopt the children.

## I. Documentary Evidence

The trial court admitted evidence of Father's 2018 conviction for the unauthorized use of a motor vehicle, and the information and Father's "guilty" plea for possession of methamphetamine on the date the children were removed from the home. The trial court further admitted evidence of Mother's drug possession charge, her failure to appear, and the resulting arrest warrant. Many photographs of the parents' home, the foster home, the children, and the parties were also admitted.

## II. Standard of Review

The decision to terminate parental rights must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001(b). Under the Family Code, "'[c]lear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.L.*, 163 S.W.3d 79,

9

84 (Tex. 2005) (citations omitted). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1), (2); *In re J.L.*, 163 S.W.3d at 84.

In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.O.A.,* 283 S.W.3d 336, 344–45 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In a factual sufficiency review, the question we must decide is not what we would have found from the evidence had we been seated as the factfinder in the trial. Rather the question is whether from the evidence as a whole the factfinder could "reasonably form a firm belief or conviction about the truth of the [Department's] allegations." *In re C.H.,* 89 S.W.3d 17, 25 (Tex. 2002). When conducting a factual-sufficiency review, we "give due deference" to the findings that are based on the direct and circumstantial evidence that was admitted before the factfinder in the trial. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (cleaned up). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* In a factual sufficiency review, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96

10

S.W.3d at 266. We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d at 25). When deciding whether a reasonable trier of fact could have formed a firm belief or conviction that the evidence supports a finding challenged in an appeal, we defer to the factfinder's role as the "'sole arbiter of the witnesses' credibility and demeanor[]'" when the inferences it drew from the evidence before it were reasonable. *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *see In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022) (citations omitted). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266.

### III. Analysis

**A. The Endangerment Findings**

"'[E]ndanger' means to expose to loss or injury[.]" *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Subjecting a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied); *see also In re J.O.*, No. 09-21-00341-CV, 2022 Tex. App. LEXIS 1769, at *31 (Tex. App.—

11

Beaumont Mar. 17, 2022, pet. denied) (mem. op.). We are required to consider the sufficiency of the evidence pursuant to Sections 161.001(b)((D) or (E) if challenged. *See In re N.G.*, 577 S.W.3d 230, 235–36 (Tex. 2019).

### 1. Statutory Ground D (Condition Endangerment)

Under subsection D, parental rights may be terminated if clear and convincing evidence supports the conclusion that the parent "knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(D). It is not necessary that the child or children have suffered any injury. *See In re J.W.*, 645 S.W.3d, at 748.

The unkempt state of the parents' home, the children's living environment, could be considered a condition of endangerment under subsection D. *See In re J.O.,* 2022 Tex. App. LEXIS 1769, at *10 (explaining that unsanitary living conditions may support a finding of condition endangerment). Although Mother explained that the interior photographs depicted the aftermath of the search warrant's execution, that explanation does not end our inquiry because the photographs of the exterior show accumulated trash that admittedly was present while the children lived there. Mother's plausible explanations for the condition of the porch and yard, that these items belonged to the property owner, explain but do not excuse the parents' decision

12

to select this residence for themselves and their children. These photographs enabled the jury to find that the children were living in endangering conditions.

Giving due deference to the jury's factual findings that Mother and Father knowingly kept the children in endangering conditions or surroundings, we cannot conclude that the jury lacked a firm belief or conviction that the State's allegations were proved by clear and convincing evidence. *See In re J.F.C*., 96 S.W.3d at 266. Giving due deference to the jury's determination of the facts, we therefore overrule Mother's condition endangerment argument.

### 2. Statutory Ground E (Conduct Endangerment)

Subsection E allows for termination of parental rights if clear and convincing evidence supports the conclusion that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(E). "Conduct" includes acts of omission, and it is not necessary that the conduct be directed at the child or that any injury result from the conduct. *See Boyd*, 727 S.W.2d at 533; *In the Interest of J.I.G*., No. 01-18-00023-CV, 2018 WL 3233874, at *8 (Tex. App.—Houston [1st Dist.] July 3, 2018, no pet.) (mem. op.). Under section E, the jury was permitted to consider conduct both before and after the children's removal. *See In re A.L.H.,* 515 S.W.3d 60, 93 (Tex. App.—Houston [14th Dist.] 2017, pet.

denied) (citing *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

Mother admitted her abuse of prescription medication after the children's removal. In fact, Mother entered a drug rehabilitation program while the termination proceedings were pending. Father's conduct included keeping methamphetamine, an illegal drug, in the home, and his admitted use of the drug. In addition, he later was incarcerated on a drug possession charge. Because a parent's continued drug use when the custody of their children is in jeopardy supports a finding of endangerment, we cannot conclude that the jury lacked sufficient evidence to find that Mother's and Father's drug use constituted conduct endangerment. *See In re S.R.*, 452 S.W.3d at 361-62 (citing *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253-54 (Tex. App.—Houston [1st Dist.] 2006, no pet.)).

We overrule Mother's and Father's conduct endangerment argument, also.

## B. The Remaining Termination Findings

Because we conclude legally and factually sufficient evidence supports the trial court's termination order under sections D and E, we need not consider Mother's and Father's arguments regarding section O. *See* Tex. Fam. Code Ann. § 161.001(b)(1); *In re N.G.*, 577 S.W.3d at 232–33; Tex. R. App. P. 47.1.

14

## C. Best Interest Finding

In their final issues, Mother and Father challenge the legal and factual sufficiency of the evidence to support the trial court's determination that terminating their respective parental rights was in the children's best interest.

There is a strong presumption that a child's best interest is served by maintaining the child's relationship with his natural parent. Tex. Fam. Code Ann. § 153.131(b); *see also In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (noting that a "strong presumption" exists favoring keeping a child with his or her parent). It is also presumed that "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." Tex. Fam. Code Ann. § 263.307(a). To reconcile these seemingly contradictory principles, the trial court is afforded "wide latitude in determining the best interests of a minor child." *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982) (citing *Leithold v. Plass*, 413 S.W.2d 698 (Tex. 1967) (other citations omitted)).

As the reviewing court, we must decide whether the record, when considered as a whole, supports the trial court's best interest finding. *See In re C.H.*, 89 S.W.3d at 28; *In re O.V.*, No. 09-21-00408-CV, 2022 Tex. App. LEXIS, at *17-18 (Tex. App.—Beaumont Mar. 31, 2022, no pet.) (mem. op.). To make this determination, we consider the non-exclusive factors identified by the Texas Supreme Court in *Holley v. Adams*, to the extent that they apply to the case before us. 544 S.W.2d 367,

371-72 (Tex. 1976).[7] The Department need not present evidence of all of the *Holley* factors; strong evidence of one factor relevant to the child's safety will support a best interest finding, while scant evidence of each *Holley* factor will not. *See In re C.H.*, 89 S.W.3d at 27.

The Family Code also identifies several additional factors relevant to a best interest analysis. *See* Tex. Fam. Code Ann. § 263.307(b). These include, among others, (i) whether there is a history of abusive or assaultive conduct by the child's family, (ii) whether there is a history of substance abuse by the child's family, (iii) whether the family is willing and able to seek and complete counseling services, (iv) the parent's willingness and ability to effect positive personal changes within a reasonable period of time, and (v) whether an adequate social support system

---

[7] These factors are as follows:

1. the child's desires;
2. the child's current and future physical and emotional needs;
3. the current and future physical and emotional danger to the child;
4. the parenting abilities of the parties seeking custody;
5. the programs available to assist the party seeking custody;
6. the plans for the child by the parties seeking custody;
7. the stability of the home or proposed placement;
8. the parent's acts or omissions that reveal that the existing parent-child relationship is improper; and
9. any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

consisting of extended family and friends is available to the child. *Id.* § 263.307(b)(7), (8), (10), (11), (13).

### 1. Desires of the Children

Because of the children's ages, there was no direct evidence of the children's desires regarding their placement. There was, however, evidence that Blake once called his foster mother "momma[;]" this evidence shows that Blake had formed a familial bond with his foster family. Although neutral as to Lauren's desires, this evidence weighs in favor of termination as to Blake.

### 2. Physical and Emotional Needs or Danger

The photographs admitted into evidence reveal that the downstairs area of the house, where Mother and Father lived with the children, was extremely small for a family of four. Moreover, the exterior was not only in an extreme state of disrepair, it was also littered with items, including an ax, which a factfinder could infer might be dangerous to a curious child.

As noted above, the presence of methamphetamine in the home endangered the children, as did the parents' admitted drug use both before and after the children's removal from the home. Other evidence points to the children's medical and emotional needs, specifically, Blake's need for therapy for his autism spectrum disorder and Lauren's need for comfort as shown by her wish to be constantly held when she came into foster care. From this evidence, the jury could have concluded

17

that the children were physically, medically, and emotionally neglected and/or endangered while they were in the parents' care, and that termination was in the children's best interest.

### 3. Parenting Abilities

The evidence that Mother did not know how to care for a toddler does not speak well of her parenting abilities, nor does her admitted abuse of prescription medication while her parental rights were in jeopardy. Father kept an illegal drug in the home where the children could have been injured by it, thus calling his parenting abilities into question, also. This evidence weighs in favor of termination.

### 4. Programs Available

Blake was receiving therapy at the time of trial, and there was testimony that Lauren was also receiving therapy. The record contains no other evidence of programs available to assist the children; therefore, this factor is neutral as to termination.

### 5. Plans For the Children

The foster parents testified that they planned to adopt both Blake and Lauren if the parents' rights were terminated. The evidence also established that the foster parents planned to continue with therapy for Blake, which indicated that the foster parents were meeting Blake's needs. This factor weighs in favor of termination.

### 6. Stability of the Home

There is no question that the foster parents' home is stable, and that this stability benefits the children. The parents' home, conversely, was not. Not only was Father in and out of prison, but Mother previously had lived with her grandmother in an apparently volatile environment. At the time of trial, Mother was living in a sober living facility after having completed an inpatient rehabilitation program and had only tentative plans to obtain stable housing after leaving the sober living facility. Although we recognize Mother's need for flexibility considering the unsettled parental rights question, her lack of suitable housing, coupled with Father's uncertain release date, weighs in favor of termination.

### 7. Parents' Acts/Omissions/Excuses

Mother offered explanations of some of the evidence that cast her in an unfavorable light. These explanations, however, are not excuses, particularly when drug abuse is involved. This evidence supports termination of Mother's parental rights.

Father pleaded "guilty" to possession of methamphetamine, with an offense date of May 6, 2021, the same date that the children were removed from the parents' home following the execution of the search warrant. From this evidence, the jury could have formed a firm belief or conviction that methamphetamine, an illegal drug, was present in the house while the children were living there, and that the children

19

therefore were in danger of being exposed to it. This evidence supports termination as to Father.

This factor weighs in favor of termination.

### 8. Overall Assessment of Best Interest

The evidence as a whole reveals that it would be in the children's best interest to terminate Mother's and Father's parental rights. Not only were their needs neglected while they remained in the parents' care, but they were endangered by the presence of an illegal drug in the house and by Mother's prescription drug abuse.

Evidence of one *Holley* factor, particularly one relevant to a child's safety, may be sufficient to support a finding that termination is in a child's best interest. *See In re K.F.*, No. 09-21-00078-CV, 2021 WL 3774703, at *6 (Tex. App.— Beaumont Aug. 26, 2021, no pet.) (mem. op.). Moreover, a parent's past performance as a parent is relevant to a determination of present and future ability to provide for a child. *See In re C.H.*, 89 S.W.3d at 28. The evidence reveals that both parents had failed to provide the children with stable housing or appropriate medical care and had abused drugs. This evidence speaks volumes about both parents' deficient parental abilities, and indicate that it is in the children's best interest that parental rights be terminated.

We conclude that the evidence is sufficient to have permitted a reasonable trier of fact to form a firm belief or conviction that Blake's and Lauren's best interest

20

was served by terminating Mother's and Father's parental rights. Accordingly, we overrule the parents' challenge to the best interest finding.

## IV. Conclusion

Given the evidence presented at trial through witnesses and all exhibits admitted, we hold a reasonable factfinder could have formed a firm belief or conviction that Mother and Father committed a predicate act under subsections D and E. We further hold that a reasonable factfinder could have formed a firm belief or conviction that terminating Mother's and Father's parental rights was in the children's best interest. We therefore affirm the trial court's order terminating Mother's and Father's parental rights.

AFFIRMED.

_____
JAY WRIGHT
Justice

Submitted on March 14, 2023
Opinion Delivered May 4, 2023

Before Golemon, C.J., Horton and Wright, JJ.