**Affirmed and Memorandum Opinion filed December 28, 2023.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-23-00498-CV

---

## IN THE INTEREST OF C.K.C., A CHILD

---

**On Appeal from the County Court at Law
Grimes County, Texas
Trial Court Cause No. 35705-CCL**

---

## M E M O R A N D U M   O P I N I O N

The trial court signed an Order of Termination terminating Mother's and Father's parental rights with respect to their seven-year-old daughter, C.K.C. ("Christy").[1]  Mother appeals the order and challenges the trial court's predicate termination findings under Texas Family Code section 161.001(b)(1)(D), (E), and (O).  Mother also challenges the trial court's finding that termination of her parental rights is in Christy's best interest.

For the reasons below, we overrule Mother's issues on appeal and affirm the

---

[1] We refer to C.K.C. using a pseudonym.  *See* Tex. Fam. Code Ann. § 109.002(d).

trial court's Order of Termination.

In May 2022, the Texas Department of Family and Protective Services (the "Department") filed an original petition seeking to terminate Mother's and Father's parental rights with respect to Christy. The parties proceeded to a bench trial before an associate judge[2] approximately one year later. We summarize relevant portions of the witnesses' testimony and evidence below.

*Mary Watkins*

Mary Watkins is a Department investigator. Watkins said she received a referral in April 2022 alleging neglectful supervision of Christy, who was then five years old. Mother was hospitalized at this time for a kidney stone and an infection and Christy was staying with her paternal grandfather ("Grandfather").

According to Watkins, Mother had made allegations regarding an "inappropriate" relationship between Christy and Grandfather. Watkins said she interviewed Grandfather and Christy about the allegations. Watkins testified that Grandfather "adequately address[ed]" the allegations and she was not concerned about Christy staying in his care.

But after interviewing Grandfather and Christy, Watkins said she was concerned about the care Mother had been providing to Christy. Watkins interviewed Mother on May 3, 2022, while Mother was staying at Grandfather's house after she was discharged from the hospital. Watkins performed an oral swab drug test on Mother, which came back positive for methamphetamines. Shortly

---

[2] The Texas Family Code permits a judge to refer certain matters, including a suit affecting the parent-child relationship, to an associate judge for a ruling. *See* Tex. Fam. Code Ann. § 201.005(a). Upon ruling on the matter, the associate judge must issue a proposed order or judgment containing the associate judge's findings, conclusions, or recommendations. *Id.* § 201.011(a).

thereafter, Watkins filed an "Affidavit in Support of Emergency Removal" in the trial court, which also was admitted into evidence during trial.

According to the affidavit, Mother was admitted to the hospital on April 19, 2022. The affidavit states that Mother reported to hospital staff that Grandfather had inappropriate interactions with Christy, including "posting naked photos" of her and "sleep[ing]" with her.

The affidavit then describes Watkins' interview with Grandfather. Watkins recounts that Grandfather said Christy had lived with him since she was eight months old. According to Grandfather, Mother lived with him about half the time and, when she lived elsewhere, occasionally would take Christy with her. Grandfather said that Christy told him she and Mother would visit "Mr. Pirate," whom Grandfather believed was a drug dealer. Grandfather recalled that Christy said she heard Mr. Pirate "talking about killing someone." Grandfather also stated that, when Christy would return to his home, she would say that she and Mother "slept in the car" while they were gone.

Discussing Mother's allegations against him, Grandfather said he took a picture of Christy while she was swimming and posted it on his Facebook. Grandfather said Christy sometimes slept in his bed and that Mother would "get upset that [Christy] doesn't want to sleep with her." Grandfather said he had a good relationship with Christy and "has never done anything inappropriate with or towards" Christy. Watkins' affidavit then briefly recounts her interview with Christy, whom she described as "clean, appropriately dressed, happy and healthy." Watkins stated that Christy did not make an outcry of abuse or neglect during the interview.

Next, the affidavit discusses Watkins' interview with one of Mother's nurses at the hospital. The nurse said Mother was admitted for a kidney stone and an

3

infection. According to the nurse, Mother tested positive for "amphetamines, benzoids, and opioids" on two separate occasions: April 22 and April 29. The nurse stated that hospital staff suspected Mother "was being brought in drugs by her boyfriend" because "none of the medications they provided would explain the positive drug screens." The nurse explained further that "the drug tests were taken with enough time in between that the second drug test would have been clean even if [Mother] had drugs in her system when she was admitted into the hospital."

Further substantiating these allegations, the nurse recalled that Mother "would go in the bathroom for hours at a time." The nurse stated that, on one occasion when Mother's boyfriend was visiting Mother in her hospital room, he "was out of it asleep" and "wouldn't wake or stir even with the loudest of noises."

Continuing on, the affidavit discusses Watkins' interview with Mother shortly after Mother's discharge from the hospital. Mother denied using drugs while hospitalized. Watkins informed Mother that Mother would need to undergo drug testing and that a "safety plan" would be implemented with respect to Christy's care. According to Watkins, Mother "got very angry" and was "very upset" and "yelling." Since Mother did not agree to the safety plan, Watkins informed Mother that "the Department would be taking emergency custody" of Christy. In lieu of the Department placing Christy in foster care, Mother agreed to stay at a local motel while Christy stayed in Grandfather's care.

Finally, the affidavit concludes with a summary of Mother's history with the Department. In 2020, the Department received a referral alleging neglectful supervision of Christy by Mother. The report stated that Mother and Christy were living in a "storage unit" and alleged that Mother used drugs and that those drugs were left where Christy could access them. During the investigation into this referral, Mother tested positive for amphetamines and methamphetamines.

4

### Lindsey Cason

Cason is a substance abuse counselor with Monarch Family Services. Cason completed Mother's substance abuse assessment in June 2022. Cason said Mother reported a history of using alcohol, marijuana, cocaine, and methamphetamines. According to Cason, Mother reported taking methamphetamines approximately ten times in the past two years. Ultimately, Cason recommended that Mother complete 12 substance abuse counseling sessions. Cason said Monarch was unable to schedule Mother to complete any of her sessions.

### Melissa Muzny

Muzny is a licensed professional counselor. Muzny had twelve counseling sessions with Christy prior to her testimony at trial.

According to Muzny, after her meetings with Christy and conversations with Grandfather, she did not have any concerns about whether Grandfather had been or was "inappropriate" with Christy. Muzny testified that Grandfather was a "very stable" caregiver.

Despite Mother's allegations regarding Christy sleeping in Grandfather's bed, Muzny said she did not have any concerns about the appropriateness of the relationship between Grandfather and Christy. According to Muzny, Grandfather had requested help "devising a sleep plan" for Christy since she "has been sleeping in his bed since she was a baby" and "struggles to stay in her own bed at night." Muzny said Grandfather was "making ongoing efforts" to address the issue. But overall, Muzny said Christy was "very well adjusted" and did not have any behavioral problems. Muzny said Christy would be best suited if she continued to live with Grandfather.

Muzny testified that Christy "advised [Muzny] that she does not like talking

5

about her biological parents, her mom or her biological dad. And it would stress her out." When asked about specific concerns Christy relayed to her, Muzny responded:

> [Christy] has shared with me, and I documented that in [the] notes that she is aware that her mother does drugs. She feels like her mother lies about doing drugs. She has not mentioned her biological father doing drugs. It's — the conversation has always been about her biological mother.

### Kimberly Nobles

Nobles is a Department caseworker and worked on Christy's case from November 2022 through February 2023. While she was assigned to Christy's case, Nobles said she was unable to meet with Mother in person because Mother "was not willing to give us her address or location." Nobles said she "frequently" spoke to Mother over the phone and via text.

Nobles testified that Mother's family service plan required safe and stable housing, a stable form of income, a physiological evaluation, a parenting course, a substance abuse assessment, and drug testing. According to Nobles, when she took over the case in November 2022, Mother had completed the initial drug testing and substance abuse assessment. Nobles said Mother's May 2022 drug test tested positive for methamphetamines.

While she was assigned to Christy's case, Nobles said Mother did not complete any of the other prescribed services. Nobles testified that she would send Mother weekly authorizations for drug testing but Mother "never complied." Nobles said she would try to call and text Mother but Mother "wouldn't respond."

Nobles also said she was unable to verify Mother's housing because Mother would not provide her address. According to Nobles, Mother provided an address in December 2022 but Nobles was never able to speak to the landlord.

Nobles said Mother provided information about her employer in December 2022. Nobles said she requested employment documentation or check stubs from Mother but never received any. As of the time of trial, Nobles said she did not believe Mother worked at the same employer.

According to Nobles, Mother had weekly virtual visits with Christy. Nobles said Mother would have been entitled to in-person visitation if she "was able to string together two consecutive negative drug tests" but Mother was unable to make that showing. Nobles recalled that Mother was "usually there on her visitations" but there were "many times that she was late to her virtual visits."

In sum, Nobles testified that, "[b]ased upon [her] involvement in the case," she believed it was in Christy's best interest that Mother's parental rights be terminated. Nobles said Christy "is very stable where she's at" and is "very bonded" with Grandfather. Nobles said she had no concerns about Grandfather as Christy's adoptive placement.

### *Aaron Henry*

Aaron Henry is the Department caseworker currently assigned to Christy's case. Henry said Mother has not completed any prescribed services since he took over the case in February 2023. Henry said Mother also has not completed the prescribed drug testing.

Admitted into evidence during Henry's testimony was a May 30, 2023 police report from the Conroe Police Department. The report states that Mother was pulled over for a traffic stop on that day and "dispatch advised that [she] had three active warrants through the City of Conroe." Mother was placed under arrest and transported to the Montgomery County Jail.

Henry said it would be in Christy's best interest if Mother's parental rights

7

were terminated. Henry said Christy is currently "doing great" and testified that Grandfather has "done great things" for Christy.

*Grandfather*

According to Grandfather, Christy has lived with him about 90% of the time since she was eight months old. Grandfather said he and Christy live in a double-wide mobile home on six acres of land. Grandfather said they also care for horses, dogs, and cats that live on the property.

Grandfather said his son (Father) was sent to prison for drugs when Christy was 10 months old. According to Grandfather, he permitted Mother to move into his home at that time so she could work on her family service plan. Grandfather said Mother originally agreed that he could adopt Christy but Mother later contested the planned adoption, which caused his attorney's fees to increase significantly. Grandfather said he did not pursue the adoption because he no longer could afford his attorney's fees.

Grandfather said Mother would still stay with him but "would take off with [Christy] sometimes when [Mother] would get mad at [Grandfather]." Grandfather said Mother would "t[ake] off for three or four days and wouldn't let me know where they were at. And then she would come home." Grandfather said Christy would relay to him that she and Mother were staying with a guy who "kicked them out."

Grandfather said he was concerned about Mother living with him because she previously had "lied about [Grandfather] and accused [Grandfather] of various things on multiple times." Elaborating, Grandfather testified that Mother said: "all I have to do is accuse you of abuse, and I'll get a restraining order, and your ass will be out of here." After Mother's allegations, Grandfather said he began

wearing a body camera around the house.

Grandfather said Christy has been living with him full-time since Mother's April 2022 hospital visit. After Mother moved out shortly thereafter, Grandfather said he found what he believed to be a "meth pipe" in Mother's bathroom.

Discussing Christy's progress, Grandfather said Christy "started off first grade a little rough" but her teacher gave Grandfather "a lot of stuff to work with her." Grandfather said he and Christy worked together every day before school and she "ended up on the AB honor roll." Grandfather testified that he takes Christy to the school bus every day and eats lunch with her on Fridays at school. Grandfather said he and Christy have also started visiting her maternal grandparents on Sundays after church.

Grandfather said he would like to adopt Christy after the conclusion of the proceedings. Grandfather said he hopes Christy can have a relationship with Mother and Father when they are in a more stable place.

### Leslie Janac

Leslie Janac is a CASA volunteer and had spent time with Christy for several months before trial. Describing Christy as "extraordinary," "sweet," and "intelligent," Janac said she has "never come across a more giving, sweet, loving little girl." Janac testified that she did not have any concerns about Grandfather's ability to care for Christy and said they "have a wonderful grandfather-granddaughter relationship."

Janac said CASA's position was that termination of Mother's parental rights would be in Christy's best interest. Allowing Grandfather to adopt Christy, Janac explained, "means there is permanency and stability in [Christy's] life."

*Mother*

According to Mother, Grandfather and Father worked together to "conceal" Christy from her when Christy was ten months old. Mother said Grandfather and Father "concealed [Christy] for nine months" and she "had to go fight for custody for a long time."

Discussing her allegations regarding Grandfather's relationship with Christy, Mother testified:

> I voiced my concerns that I — I have always voiced about it. That he guilts her into sleeping in his room with him every night. I never said anything about molestation ever. But I said it's just weird that a 70-year-old man, you know, guilts — makes her feel bad. Tells her he's going to have bad dreams if she won't sleep in his room with him.

Mother said she was admitted to the hospital in April 2022 for a kidney stone and, when she was released, stayed at Grandfather's home. Mother denied yelling at Watkins or having any conversations about a safety plan.

When asked why she did not comply with the drug testing prescribed by her family service plan, Mother said she "was scared. [She] thought they would — they would lie, like they did about the hospital ones. Because the hospital drug tests. I did not fail them. They were my prescription medicines that they tested." Mother said she previously used methamphetamines only once.

Mother said she currently works as a construction surveyor and has worked for her employer "[o]n and off for several years."

Mother said she has concerns about Christy continuing to live with Grandfather because she does not want Christy "to learn to be dishonest like that or manipulative." Mother asked that her parental rights not be terminated.

*Leonard Viar*

Leonard Viar said he is Mother's employer and that she has worked for him "[o]ff and on for eight years." Viar said he and Mother "were friends a long time before she went to work for [him]."

Viar said Mother works as a construction surveyor. Viar said he administers monthly drugs tests to his employees, including Mother. Viar said Mother's testing results did not give him any cause for concern.

*Father*

During his testimony, Father offered into evidence an "Affidavit of Voluntary Relinquishment of Parental Rights." Father testified that he was voluntarily relinquishing his parental rights with respect to Christy. According to Father, it would be in Christy's best interest for her to be adopted by Grandfather.

Father also said he believed termination of Mother's parental rights was in Christy's best interest. Father said he had known Mother for 8 years and agreed that they had done drugs together. Father said he was "concern[ed]" that Mother "may be high" during trial because she was "a little relaxed" and had "slowed speech."

*Conclusion*

The associate judge signed a proposed Order of Termination on June 27, 2023, terminating both Mother's and Father's parental rights with respect to Christy. The associate judge found that termination of Mother's parental rights was in Christy's best interest and warranted under three subsections of section 161.001(b)(1) of the Texas Family Code: (D) (endangerment by environment), (E) (endangerment by conduct), and (O) (failure to comply with family service plan).

On July 6, 2023, the trial court signed an order adopting the associate

11

judge's Order of Termination. Mother timely appealed.

ANALYSIS

Raising four issues on appeal, Mother asserts the evidence is legally and factually insufficient to support the trial court's findings that:

1. termination is warranted under section 161.001(b)(1)(O) (failure to comply with family service plan);

2. termination is warranted under section 161.001(b)(1)(D) (endangerment by environment);

3. termination is warranted under section 161.001(b)(1)(E) (endangerment by conduct); and

4. termination of Mother's parental rights is in Christy's best interest.

We consider these issues individually below.

## I. Burdens of Proof and Standards of Review

Involuntary termination of parental rights is a serious matter that implicates fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re J.E.M.M.*, 532 S.W.3d 874, 879 (Tex. App.—Houston [14th Dist.] 2017, no pet.). But although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). Given the fundamental liberty interests at stake, "termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20.

Parental rights may be terminated if clear and convincing evidence shows (1) the parent committed an act described in section 161.001(b)(1) of the Texas Family Code, and (2) termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1), (2). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm

12

belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

This heightened burden of proof results in heightened standards of review for evidentiary sufficiency. *In re V.A.*, 598 S.W.3d 317, 327 (Tex. App.—Houston [14th Dist.] 2020, pet. denied). For a legal sufficiency challenge, we consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all controverting evidence a reasonable factfinder could disbelieve. *Id.*

For a factual sufficiency challenge, we consider and weigh all the evidence, including disputed or conflicting evidence, to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *In re C.H.*, 89 S.W.3d at 25. We examine whether disputed evidence is such that a reasonable factfinder could not have resolved that dispute in favor of its finding. *Id.*

The factfinder is the sole arbiter when assessing the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). "We may not second-guess the factfinder's resolution of a factual dispute by relying on disputed evidence or evidence the factfinder 'could easily have rejected as not credible.'" *In re V.A.*, 598 S.W.3d at 328 (quoting *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003)).

## II.    Predicate Termination Findings

Mother asserts the evidence is legally and factually insufficient to support

the trial court's finding that termination is warranted under three subsections of section 161.001(b)(1) of the Texas Family Code. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O).

"To affirm a termination judgment on appeal, a court need uphold only one termination ground — in addition to upholding a challenged best-interest finding — even if the trial court based the termination on more than one ground." *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam). Predicate findings under subsections (D) and (E), however, pose significant collateral consequences. *See id.* at 234, 235 (discussing section 161.001(b)(1)(M), which provides that a court may terminate a parent's rights if it finds, by clear and convincing evidence, that the parent has had his "parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E)"). In light of these consequences, we are required to consider the sufficiency of the evidence pursuant to subsections (D) or (E) when raised on appeal. *Id.* at 235; *see also, e.g., In re P.W.*, 579 S.W.3d 713, 721, 728 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

### A.    Subsection E

Subsection (E) allows for termination of parental rights if clear and convincing evidence supports a conclusion that the parent "engaged in conduct . . . which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). "Endanger" means to expose the child to loss or injury or to jeopardize the child's emotional and physical health. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam). For purposes of this section, "conduct" refers to the parent's acts, omissions, and failures to act. *In re K.J.B.*, No. 14-19-00473-CV, 2019 WL 5704317, at *7 (Tex. App.—Houston [14th Dist.] Nov. 5, 2019, pet. denied) (mem. op.).

While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer injury. *In re V.A.*, 598 S.W.3d at 331. Rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re S.R.*, 452 S.W.3d 351, 361 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re A.L.H.*, 515 S.W.3d 60, 92 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

Termination under this subsection must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *In re S.R.*, 452 S.W.3d at 361. A court may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct." *In re V.A.*, 598 S.W.3d at 331.

A parent's continuing substance abuse can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Additionally, a factfinder reasonably can infer that a parent's failure to submit to court-ordered drug tests indicates that the parent was avoiding testing because the parent was using illegal drugs. *In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.). A parent's drug use exposes the child to the possibility the parent may be impaired or imprisoned and, thus, unable to take care of the child. *In re V.A.*, 598 S.W.3d at 331. But a parent's illegal drug use is not, on its own, sufficient evidence of endangerment; there also must be a showing of a causal connection between the parent's drug use and endangerment of the child. *In re L.C.L.*, 599 S.W.3d 79, 84-

15

86 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (en banc).

Here, the record establishes a voluntary, deliberate, and conscious course of conduct by Mother that endangered Christy's emotional and physical well-being.

As shown by the summary of evidence and witness testimony presented at trial, Mother has a lengthy history of substance abuse. Watkins' "Affidavit in Support of Emergency Removal" discusses Mother's history with the Department and states that, in 2020, the Department received a referral alleging neglectful supervision of Christy by Mother. The report stated that Mother and Christy were living in a "storage unit" and alleged that Mother was using drugs and that those drugs were left where Christy could access them. During the investigation into this report, Mother tested positive for amphetamines and methamphetamines.

Additional evidence of Mother's substance abuse came to light when Watkins was investigating the April 2022 referral, again alleging neglectful supervision of Christy by Mother. At this time, Mother was hospitalized for a kidney stone and an infection. Watkins' affidavit discusses an interview with one of Mother's nurses who suspected that Mother was "being brought in drugs by her boyfriend" because (1) Mother tested positive for "amphetamines, benzoids, and opids" on two separate occasions a week apart, (2) Mother was spending "hours" in the bathroom, and (3) Mother's boyfriend was "out of it asleep" during one of his visits to Mother's hospital room and "wouldn't wake or stir even with the loudest of noises."

When Watkins visited Mother at Grandfather's home shortly thereafter on May 3, 2022, Watkins performed an oral swab drug test on Mother that came back positive for methamphetamines. After Mother moved out of Grandfather's home a few days later, Grandfather said he found a "meth pipe" in the bathroom Mother had been using.

16

Grandfather provided additional evidence about Mother's and Christy's relationship and the effects of Mother's substance abuse. In Watkins' affidavit, she recounted a conversation with Grandfather in which he stated that Mother would occasionally take Christy with her to live elsewhere. According to Grandfather, Christy had told him she and Mother would visit "Mr. Pirate," whom Grandfather believed was a drug dealer. Grandfather said Christy also told him she and Mother slept in their car.

Testifying at trial, Grandfather said Mother would "take off" with Christy for three or four days when she would "get mad" at Grandfather. Grandfather said Mother would not tell him where she and Christy were staying. On at least one occasion, Grandfather said Christy told him she and Mother were staying with a man who "kicked them out."

Grandfather said Mother also threatened to accuse him of abusing Christy, after which he started wearing a body camera around the house. When Mother was admitted to the hospital in April 2022, she reported that Grandfather had an "inappropriate" relationship with Christy. Watkins investigated these allegations and did not find any evidence to corroborate them. Similarly, Muzny, Nobles, Henry, and Janac testified that they did not have any concerns about Grandfather's relationship with Christy.

Muzny also provided testimony regarding the direct effects of Mother's substance abuse on Christy. According to Muzny, Christy did not like talking about Mother and Father because "it would stress her out." Muzny also said Christy "is aware that her mother does drugs" and "feels like her mother lies about doing drugs."

This evidence, taken together, shows a voluntary, deliberate, and conscious course of conduct by Mother that has endangered Christy's physical and emotional

17

well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E); *In re A.L.H.*, 515 S.W.3d at 92; *In re S.R.*, 452 S.W.3d at 361. Mother has a history of substance abuse and the evidence shows a pattern of actions exposing Christy to instability and uncertainty, including sporadically removing her from her Grandfather's care, having her stay overnight in storage units and the family car, threatening to damage her relationship with Grandfather, and using drugs around her. Accordingly, this evidence is legally and factually sufficient to support the trial court's finding that Mother engaged in a pattern of conduct that endangered Christy's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E). We overrule Mother's third issue challenging the trial court's predicate finding under this subsection.

Because we conclude the evidence is sufficient to support termination under subsection (E), we need not address the trial court's finding pursuant to subsection (D). *See In re N.G.*, 577 S.W.3d at 232; *see also, e.g.*, *In re P.W.*, 579 S.W.3d at 728. Likewise, we need not address Mother's challenge to the trial court's finding pursuant to subsection (O). *See In re N.G.*, 577 S.W.3d at 232-33. We therefore also overrule Mother's first and second issues.

## III. Best Interest Finding

In her fourth issue, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that termination of her parental rights is in Christy's best interest.

Termination must be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(2). There is a strong presumption that the best interest of a child is served by keeping the child with the child's parent. *Id.* § 153.131(b); *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Prompt, permanent placement of the child in a safe environment also is presumed to be in the child's best interest.

18

*See* Tex. Fam. Code Ann. § 263.307(a).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the trial court's best-interest finding: the desires of the child; the physical and emotional needs of the child now and in the future; the emotional and physical danger to the child now and in the future; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and any excuses for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to consider in evaluating parent's willingness and ability to provide the child with a safe environment). This list of factors is not exhaustive and evidence is not required on all the factors to support a finding that termination is in the child's best interest. *In re I.L.G.*, 531 S.W.3d 346, 355 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

Evidence supporting termination under one of the predicate grounds listed in section 161.001(b)(1) also can be considered in support of a finding that termination is in the child's best interest. *In re S.R.*, 452 S.W.3d at 366. Accordingly, the evidence showing conduct by Mother that endangered Christy's emotional and physical well-being, for purposes of subsection (E), is relevant to our best-interest analysis.

### *The Child's Desires*

Although Christy did not testify at trial, other evidence suggests her preference would be to remain with Grandfather. According to Muzny, Christy

19

expressed in her counseling sessions that she did not like talking about Mother, that she is aware Mother does drugs, and that she feels like Mother lies about doing drugs. Muzny testified that Christy would be best suited if she continued to live with Grandfather.

Similarly, Nobles testified that Christy "is very stable where she's at" and is "very bonded" with Grandfather. Henry also said Christy is currently "doing great" and testified that Grandfather has "done great things" for Christy. Grandfather also said he would like to adopt Christy after the conclusion of the proceedings.

***The Physical and Emotional Danger to Christy Now and in the Future***

With respect to this factor, "a parent's drug use supports a finding that termination is in the best interest of the child." *In re L.G.R.*, 498 S.W.3d at 204; *see also In re I.L.G.*, 531 S.W.3d at 355 ("The factfinder can give great weight to the significant factor of drug-related conduct.") (internal quotation omitted).

We discussed above Mother's history of substance abuse and its effects on Christy's stability. *See In re A.M.T.*, No. 14-18-01084-CV, 2019 WL 2097541, at *8 (Tex. App.—Houston [14th Dist.] May 14, 2019, pet. denied) (mem. op.) ("Continued drug use may be considered as a factor in the trial court's determination that termination is in the child's best interest."). The evidence also shows that Mother has not taken any of the prescribed steps to help with her substance abuse issues. Mother has repeatedly denied using drugs and, with respect to the positive drug tests during her hospital stay, said they were "lies."

Mother also was prescribed 12 substance abuse counseling sessions but has not completed any of them. According to Nobles, she would send Mother weekly authorizations for drug testing but Mother "never complied." Nobles also said she

would try to call and text Mother but Mother "wouldn't respond." Although two consecutive negative drug tests would have entitled Mother to an in-person visit with Christy, Nobles said Mother was unable to make that showing.

Considered together, this evidence supports the finding that returning Christy to Mother's care would risk physical and emotional danger to her now and in the future.

### *Christy's Physical and Emotional Needs Now and in the Future*

As discussed above, the evidence shows that Grandfather is meeting Christy's current physical and emotional needs. According to Grandfather, Christy has lived with him 90% of the time since she was eight months old. Grandfather said they live on six acres of land, where Christy helps him care for their horses, dogs, and cats. Although Christy had a slow start in first grade, Grandfather said they worked together every day before school and she "ended up on the AB honor roll." Grandfather said he walks Christy to the school bus each day and eats lunch with her at school on Fridays. This positive relationship was echoed by the Department's other witnesses, who uniformly expressed that Christy should continue to live with Grandfather.

In contrast, the evidence shows that Mother has had difficulty meeting Christy's physical and emotional needs. Evidence shows that Mother has not always provided a stable living situation for Christy and that she and Mother have previously lived in a storage unit and spent nights in their car. According to Nobles, the Department was unable to verify whether Mother obtained stable housing because Mother would not provide her address. Nobles also testified that Mother had not shown she was able to maintain stable employment.

Moreover, Mother did not complete the services prescribed in her family

21

service plan, which included individual counseling, a substance abuse program, and parenting classes. *See In re I.L.G.*, 531 S.W.3d at 355 ("In determining the best interest of the child in proceedings for termination of parental rights, the trial court may properly consider that the parent did not comply with the court-ordered service plan for reunification with the child.").

This evidence would permit the trial court to conclude that returning Christy to Mother's care would not best serve Christy's physical and emotional needs.

### Acts or Omissions That Suggest the Existing Parent-Child Relationship is Not Appropriate and Any Excuses for Those Acts or Omissions

We discussed above Mother's pattern of substance abuse. The evidence also shows that Mother has not taken responsibility for the substance abuse nor taken any steps to remediate it. Rather, the evidence shows that Mother will go to great lengths to maintain access to drugs, including while she is hospitalized.

Moreover, while she was hospitalized, Mother alleged that Grandfather had an inappropriate relationship with Christy — an allegation that could have jeopardized Christy's living situation with Grandfather. Multiple witnesses testified that these allegations were unfounded and that they did not have concerns about Grandfather's and Christy's relationship.

### Conclusion

Viewing the evidence in the light most favorable to the judgment for our legal sufficiency analysis and all the evidence equally for our factual sufficiency analysis, we conclude that a reasonable factfinder could have formed a firm belief or conviction that termination of Mother's parental rights was in Christy's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2). We overrule Mother's fourth issue.

22

## CONCLUSION

We affirm the trial court's Order of Termination signed July 6, 2023.


/s/     Meagan Hassan
Justice


Panel consists of Justices Hassan, Poissant, and Wilson.