

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-24-00683-CV

**IN THE INTEREST OF J.T.R.W.**, a Child

From the 288th Judicial District Court, Bexar County, Texas
Trial Court No. 2023PA01446
Honorable Richard Garcia, Judge Presiding

Opinion by:     Adrian A. Spears II, Justice

Sitting:     Lori I. Valenzuela, Justice
             Lori Massey Brissette, Justice
             Adrian A. Spears II, Justice

Delivered and Filed: March 26, 2025

AFFIRMED

A.W.[1] appeals from the trial court's judgment terminating her parental rights to her five-year-old son, J.T.R.W. We affirm.

**BACKGROUND**

On September 26, 2023, the Texas Department of Family and Protective Services ("the Department") filed suit to terminate A.W.'s parental rights along with an affidavit in support of emergency removal of J.T.R.W. The trial court granted the request for emergency removal and

---

[1]To protect the identity of the minor child, we refer to the child and the parties by fictitious names, initials, or aliases. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

appointed the Department J.T.R.W.'s temporary sole managing conservator. J.T.R.W. was then removed from A.W.'s care and placed in a foster home.

Almost a year later, on August 30, 2024, the trial court held a bench trial. The evidence at trial consisted of testimony from two witnesses—a Department caseworker, Derick Thomas, and A.W.

**Caseworker's Testimony**

Thomas testified that A.W. had a history with the Department. Because of A.W.'s drug use, her parental rights to another child, a daughter, had been terminated. Thomas described the incident that led to J.T.R.W.'s removal. Police officers encountered four-year-old J.T.R.W. riding a scooter on the street and about to enter the highway. J.T.R.W. was dirty and had a smelly odor. At the time, A.W. blamed the child's father for not supervising J.T.R.W. The child's father blamed A.W. for not supervising J.T.R.W. Immediately after the incident, the child's father tested positive for methamphetamines. A.W. refused to take a drug test.

Thomas also testified that after J.T.R.W.'s removal, the Department prepared a service plan for A.W. Thomas, who reviewed her service plan with A.W. on a monthly basis, believed A.W. understood its contents. A.W.'s service plan required her to (1) participate in drug treatment, (2) submit to drug testing, (3) complete a psychological evaluation, (4) engage in individual therapy, and (5) maintain stable housing and employment. A.W. completed only the first half of her psychological evaluation. The results of this evaluation showed that A.W. required drug treatment, individual therapy, and parenting classes. Although A.W. was provided with the contact information for a drug treatment facility, A.W. never contacted the facility to begin drug treatment while the case was pending. Although A.W. was provided with a therapist's contact information, A.W. did not contact the therapist to begin individual counseling while the case was pending.

Thomas acknowledged that, about two weeks before trial, A.W. finally contacted the therapist and made her first appointment for individual counseling but the appointment had not yet taken place.

Thomas testified that he asked A.W. to drug test multiple times while this case was pending. A.W. submitted to thirteen of these drug tests but she refused to submit to nine of them. Only two of A.W.'s thirteen drug tests were negative. Thomas discussed the drug test results and A.W.'s illegal drug use with her. A.W. admitted to Thomas that she was using marijuana, but she denied that she was using methamphetamines and opiates. Nevertheless, about three months before trial, A.W. told Thomas that she supported herself by selling methamphetamines.

Thomas further testified that A.W. attended two months of parenting classes, but she did not finish the course. A.W. told Thomas many times that she was on a list to obtain housing, but she never showed him any proof that she had obtained housing. Thomas recognized that A.W. consistently visited J.T.R.W. until July 2024, which was about a month before trial. Thomas had no concerns about A.W.'s visits until her final visit, where she appeared to be on drugs and left the visit early. Thomas acknowledged that A.W. was bonded with J.T.R.W. and that she loved him. However, Thomas did not believe that A.W. had taken responsibility for the issues that had brought J.T.R.W. into the Department's care, and she had not demonstrated any changes in her behavior in the year the case was pending.

Thomas believed that drug use had been a part of A.W.'s life for at least twenty years. Thomas did not think A.W. had taken full accountability for her drug use and he did not think she could be a safe parent. Thomas acknowledged that in the two weeks immediately preceding trial A.W. had attempted to engage in some of her services. Nevertheless, Thomas felt that overall A.W. had not taken her services "seriously, especially when it [came] to drug use and discontinuing using." In Thomas's opinion, J.T.R.W. could not be returned to A.W.'s care with any assurance

that the child would be safe. Thomas added that A.W. had a lengthy criminal history dating back to 2003, and she had recently been arrested and charged with assault.

Since his removal, J.T.R.W. had been in the same foster home. At the beginning of the case, J.T.R.W. was diagnosed with autism and he received occupational therapy and speech therapy. J.T.R.W. was making significant progress. At removal, J.T.R.W. was shy and nonverbal. However, after almost a year in the same foster home, J.T.R.W. was "very open" and talking. He was even learning some words in Spanish. J.T.R.W. was making progress in other areas, such as learning to eat a variety of foods. According to Thomas, all the child's needs were being met in the foster home and the child was thriving. The Department's permanency plan for J.T.R.W. was adoption by a non-relative. Although J.T.R.W.'s current foster home was not a foster-to-adopt home, a foster-to-adopt home had been identified for him.

**Mother's Testimony**

A.W. testified that until three months before trial she was still selling illegal drugs. A.W. admitted that she continued to use methamphetamines while this case was pending because she "was selling illegal drugs and had to make sure they were real. So, of course, I'm going to take them." A.W. admitted that she had tested positive for methamphetamines while the case was pending, but she insisted that she had stopped using methamphetamines by the time of trial. A.W. also claimed that the only illegal drug she was currently using was marijuana. A.W. admitted that her parental rights to another child had been terminated because of her drug use and that she was aware of how this type of case works.

As to her services, A.W. testified that she had only three modules left to complete her parenting course, and that she had made an appointment for individual counseling for the Tuesday after trial. A.W. admitted that a new criminal charge had been filed against her for an assault on

the elderly, but she contended the charge was bogus because the complaining party "came at [her] belligerent [and] drunk." A.W. testified that she could not provide for J.T.R.W.'s "needs, as far as stable housing." However, A.W. also testified that she was living at Haven for Hope, that J.T.R.W. could live at the shelter with her, and that she and J.T.R.W. had lived there in the past. A.W. further testified that she would not neglect J.T.R.W. or put him in danger because of "illicit drug use." A.W. stated that she currently had lawful employment as a custodian.

Finally, A.W. testified that when the police officers found J.T.R.W. riding a scooter on the street and about to enter the highway, the child's father was supposed to be watching him. A.W. told the police that she had put J.T.R.W.'s father in charge of him so that she could sleep. A.W. claimed that she had no idea that J.T.R.W. had gone out to the garage. According to A.W., when J.T.R.W. was found riding a scooter in the street, she was "passed out" because she is anemic. A.W. explained that the child's father was also "passed out after days of being up" from using methamphetamines, but A.W. also claimed that she did not realize how much methamphetamine the child's father had used. A.W. agreed that it was dangerous for J.T.R.W. to be wandering the streets alone for hours and he could have been killed.

After hearing the evidence, the trial court terminated A.W.'s parental rights under subsections 161.001(b)(1)(O) [failure to comply with terms of a court-ordered service plan] and (P) [use of a controlled substance in a manner endangering the health or safety of the child and failure to complete a court-ordered substance abuse treatment program] of the Texas Family Code. The trial court also found that termination of A.W.'s parental rights was in J.T.R.W.'s best interest. *See* TEX. FAM. CODE § 161.001(b)(2). A.W. appealed.

## SUFFICIENCY OF THE EVIDENCE

In her sole issue, A.W. argues the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in J.T.R.W.'s best interest.

To terminate parental rights pursuant to section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence that parental rights should be terminated under at least one of the predicate grounds in subsection 161.001(b)(1) and that termination of parental rights is in the best interest of the child. TEX. FAM. CODE § 161.001(b)(1), (2). In reviewing the legal sufficiency of the evidence to support these findings, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id.* at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). Under these standards, the factfinder is the sole judge of the weight and credibility of the evidence. *Id.* at 346.

The best interest inquiry is "child-centered and focuses on the child's well-being, safety, and development." *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018); *In re B.N.*, No. 09-22-00108-CV, 2022 WL 4546573, at *7 (Tex. App.—Beaumont Sept. 29, 2022, no pet.) ("In a best-interest analysis, courts focus on the best interest of the child, not the best interest of the parent."). The law presumes that the child's best interest is served by keeping him with his parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, the law also presumes that the prompt and permanent

placement of the child in a safe environment is in his best interest. TEX. FAM. CODE § 263.307(a). When determining if a parent is willing and able to provide a child with a safe environment, the trial court should consider the relevant factors contained in section 263.307. *See* TEX. FAM. CODE § 263.307(b).[2] A factfinder may also consider the factors articulated by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).[3] "The *Holley* factors are neither all-encompassing nor does a court need to find evidence of each factor before terminating the parent-child relationship." *In re E.A.R.*, 672 S.W.3d 716, 721–22 (Tex. App.—San Antonio 2023, pet. denied). The predicate grounds for termination may also be probative of the child's best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). Furthermore, in determining whether termination of the parent-child relationship is in the child's best interest, a factfinder may judge a parent's future conduct by her past conduct. *In re Z.R.M.*, 665 S.W.3d 825, 829 (Tex. App.—San Antonio 2023, pet. denied).

---

[2]These factors include (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b).

[3]These factors include, but are not limited to, the following: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013) (citing *Holley*, 544 S.W.2d at 371-72).

"This court has recognized that a parent's frequent or long-term drug use is relevant to a best interest determination, and it can support a factfinder's firm belief or conviction that termination of [a parent's] parental rights is in the child[]'s best interest." *In re A.F.*, No. 04-20-00216-CV, 2020 WL 6928390, at *3 (Tex. App.—San Antonio Nov. 25, 2020, no pet.). "Drug use can destabilize the home and expose children to physical and emotional harm if not resolved." *In re J.J.V.M.M.*, No. 04-22-00405-CV, 2022 WL 17479144, at *5 (Tex. App.—San Antonio Dec. 7, 2022, no pet.). A parent's "failure to drug test is considered a positive test result under the law and supports an inference that she is still using drugs." *In re M.M.*, No. 04-21-00463-CV, 2022 WL 1096381, at *4 (Tex. App.—San Antonio Apr. 13, 2022, no pet.); *see also In re A.M.L.*, No. 04-19-00422-CV, 2019 WL 6719028, at *4 (Tex. App.—San Antonio Dec. 11, 2019, pet. denied) (noting the trial court "could have reasonably inferred that [parent's] failure to appear for drug testing indicated that [she] was avoiding testing because [she] was using drugs."). "[T]he factfinder may conclude that a parent's changes shortly before trial are too late to have an impact on the best-interest determination." *In re S.R.*, 452 S.W.3d 351, 368 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

Here, ample evidence showed that A.W. had a pervasive problem with illegal drug use. Although A.W. claimed she had recently stopped using methamphetamines, by her own admission she was still selling and using methamphetamines three months before trial. Thomas, the caseworker, also testified that about a month before trial, A.W. appeared to be on drugs while visiting the child. Additionally, A.W. repeatedly tested positive for illegal drugs while the case was pending. She also refused to drug test, which supports an inference of illegal drug use. Meanwhile, Thomas testified that he provided A.W. with the contact information for a drug treatment facility, but A.W. wholly failed to participate in drug treatment. Finally, A.W. admitted

that her parental rights to another child had already been terminated because of her illegal drug use.

Given A.W.'s pervasive, unaddressed illegal drug use, a reasonable factfinder could infer that A.W. was unwilling or unable to seek out, accept, and complete available services or to effect positive environmental and personal changes within a reasonable period of time. A reasonable factfinder also could have determined that A.W.'s last minute efforts to engage in individual counseling and parenting classes came too late to have an impact on the best-interest determination. As to the child, the evidence showed that J.T.R.W. was thriving and making significant improvements in his current foster home and that a foster-to-adopt home had been identified for him. J.T.R.W.'s "current placement in a stable and nurturing environment with a planned adoption further supports the trial court's finding that termination is in the child[]'s best interests." *See In re K.E.A.*, No. 04-22-00868-CV, 2023 WL 3730327, at \*4 (Tex. App.—San Antonio May 31, 2023, pet. denied).

After reviewing all the evidence in the light most favorable to the trial court's finding, we conclude a reasonable factfinder could have formed a firm belief or conviction that the termination of A.W.'s parental rights was in J.T.R.W.'s best interest. Additionally, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is not so significant that a factfinder could not reasonably have formed a firm belief or conviction that termination of A.W.'s parental rights was in J.T.R.W.'s best interest. Mindful that the best-interest inquiry is "child-centered" and focusing on J.T.R.W.'s "well-being, safety, and development," we hold the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See In re A.C.*, 500 S.W.3d at 631.

### CONCLUSION

We affirm the trial court's judgment terminating A.W.'s parental rights.

Adrian A. Spears II, Justice